1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
2
    JOSEPH McELROY              NO.3:02CV1525(AVC)
3
    VS
4
    CITY OF TORRINGTON, JAMES
5    POTTER, CAROLANN KENNEDY,
    THOMAS TELMAN, ROBERT ZORDAN,
6    KENNETH FUCHSMAN, CHRISTOPHER
    JANCO, JAYE GIAMPAOLO AND
7    JOHN B. FIELD, JR.         NOVEMBER 12, 2003

8

             DEPOSITION OF JOSEPH McELROY
9
    APPEARANCES:

10

             WILLIAMS and PATTIS, LLC
11           Attorneys for the Plaintiff
           51 Elm Street, Suite 409
12           New Haven, Connecticut  06510
           (203) 562-9931
13
           BY:  ELIZABETH BROOKS, ESQUIRE
14

15             HOWD & LUDORF
           Attorneys for Jaye Giampaolo &
16           John B. Field, Jr.
           65 Wethersfield Avenue
17           Hartford, Connecticut  06114
           (860) 249-1361
18
           BY:  JOHN J. RADSHAW, II ESQUIRE
19

20             HOWARD, KOHN, SPRAGUE & FITZGERALD, LLP
           Attorneys for remaining Defendants
21           237 Buckingham Street
           Hartford, Connecticut  06126
22           (860) 525-3101

23           BY:  CONSTANCE L. EPSTEIN, ESQUIRE

24          OKEEMAH S. HENDERSON
      NOTARY PUBLIC-LICENSED SHORTHAND REPORTER
25        CONNECTICUT LICENSE NO. 00333


    NIZIANKIEWICZ & MILLER REPORTING SERVICES
             982 Tolland Street
      East Hartford, Connecticut  06108
  (860) 291-9191      FAX:  (860) 528-1972

# Exhibit A

```
                                               2
1                       I N D E X

2    DEPONENT                              PAGE

3

4    JOSEPH McELROY

5

6    Direct Examination by Mr. Radshaw        4

7    Cross Examination by Ms. Epstein        92

8

9                 DEFENDANT'S EXHIBITS

10                (For identification)

11

     EXHIBIT                               PAGE
12
         1    Notice of deposition            8
13
         2    Complaint dated 8/20/02        29
14
         3    Memorandum dated 7/12/01       41
15
         4    Grievance letter dated 8/14/01 45
16
         5    Letter dated 8/24/01           46
17
         6    Letter dated 8/10/01           49
18
         7    Request for interrogatories    61
19
         8    Agreement for years '95 - '97  64
20
         9    Agreement for years '97 - '01  64
21
         10   Complaint dated 8/28/01        80
22

23

24
     (Original exhibits retained by Mr. Radshaw.)
25
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
982 Tolland Street
East Hartford, Connecticut  06108
(860)  291-9191      FAX:  (860) 528-1972

3

```
1              ... Deposition of JOSEPH McELROY,

2         taken pursuant to Rule 30 of the Federal

3         Rules of Civil Procedure before Okeemah S.

4         Henderson, Licensed Shorthand Reporter and

5         Notary Public for the State of Connecticut,

6         held at the Law Offices of Howd & Ludorf, 65

7         Wethersfield Avenue, Hartford, CT commencing

8         at 10:09 a.m. on  November 12, 2003.

9              S   T   I   P   U   L   A   T   I   O   N   S

10             It is hereby stipulated and agreed by

11        and among counsel for the respective parties

12        that all formalities in connection with the

13        taking of this deposition and the authority

14        of the officer before whom it is being

15        taken, may be and are hereby waived.  It is

16        further stipulated and agreed that

17        objections other than as to form are

18        reserved to the time of trial.   It is

19        further stipulated and agreed that the

20        reading and signing of said deposition by

21        the Deponent is hereby not waived.

22             It is further stipulated that the

23        proof of the qualifications of the Notary

24        Public before whom the deposition is being

25        taken is hereby waived.
```

```
                                         4
 1              (Deposition convened at 10:09 a.m.)

 2

 3                   JOSEPH McELROY, being first

 4         duly sworn by Okeemah S. Henderson, LSR

 5         and Notary Public within and for the

 6         State of Connecticut, was examined, and

 7         testified on his oath as follows:

 8

 9                        DIRECT EXAMINATION

10         BY MR. RADSHAW:

11              Q.     Good morning, Mr. McElroy.

12         Am I pronouncing your name correctly?

13              A.     McElroy.

14              Q.     Mr. McElroy, where do you

15         live?

16              A.     85 Wysteria Court in

17         Torrington, Connecticut.

18              Q.     With whom, if anyone, do you

19         reside at that address?

20              A.     My wife, my mother-in-law,

21         and two of my children.

22              Q.     How long have you been

23         married?

24              A.     Ten years.

25              Q.     What is your wife's name?
```

5

```
1           A.      Karen.

2           Q.      And your mother-in-law's

3     name?

4           A.      Doreen.

5           Q.      And her last name?

6           A.      Barger.

7           Q.      And your children, how old

8     are they?

9           A.      I have two stepchildren

10    twenty-one and eighteen and my son

11    eight.

12          Q.      What are the respective

13    names?

14          A.      Jessica is the twenty-one

15    year old's name, N-A-M-E-Y.  Jeffrey is

16    the eighteen year old and Joseph is the

17    eight.

18          Q.      Have you ever had your

19    deposition taken before?

20          A.      No.

21          Q.      I want to go over a few

22    ground rules so you understand what

23    we're doing so that we'll be efficient

24    for everyone.  As you can see, there's

25    a Court Reporter here taking down all of
```

8
1          for me, please.

2

3          (Defendants' Exhibit No. 1, notice of

4          deposition, marked for identification.)

5

6          Q.    (By Mr. Radshaw) Mr.

7     McElroy, I'm showing you a document

8     that's been marked Defendant's

9     Exhibit 1.  Can you tell me if you ever

10    saw that document before today?

11         A.    Yes.

12         Q.    When did you first see that

13    document?

14         A.    I don't recall the exact

15    date.

16         Q.    You understand that the

17    purpose of that document is what allows

18    me to have all of us here today for the

19    taking of your deposition?

20         A.    Yes.

21         Q.    When were you first hired by

22    the City of Torrington Fire Department?

23         A.    September of 1988.

24         Q.    And you've been working

25    there continuously since then?

21

1   blah, blah -- I don't want to say blah,

2   blah, that's not right.  Just different

3   discussions about hey, cap, good job on

4   the score.

5       Q.    All these people that you've

6   listed and the ones that you couldn't

7   remember, were any one of them empowered

8   to promote you from lieutenant to

9   captain under the particular rules and

10  regulations in the collective bargaining

11  agreement for the City of Torrington

12  Fire Department?

13      A.    No.

14      Q.    So while they may have

15  addressed you as captain, they had

16  absolutely no power to actually promote

17  you, did they?

18      A.    No.

19      Q.    And Deputy Chief Giampaolo,

20  he had no express power to appoint you

21  to that rank, did he?

22      A.    I don't know.

23      Q.    Why don't you know?

24      A.    Because the fifteen years

25  I've been there, the chief and deputy go

22

1          into executive sessions and they're

2          asked recommendations, they're asked to

3          evaluate and stuff like that, so they do

4          have a part of the decision making.

5                  Q.     Oh, they do.  How long have

6          you been a firefighter again?

7                  A.     Just starting my sixteenth,

8          I believe.

9                  Q.     And have you ever been an

10         officer in the union?

11                 A.     Not an officer -- well, an

12         executive board member, not a president

13         or vice president, no.

14                 Q.     What are the duties of being

15         an executive board member?

16                 A.     Dealing with some issues

17         that other firefighters may have.

18                 Q.     Like what issues?

19                 A.     Could be anything, it could

20         be their wages, it could be training.

21                 Q.     Do you participate in the

22         negotiations for the collective

23         bargaining agreement?

24                 A.     Not at the actual meeting,

25         just as a board meeting member.

23

1          Q.     And when a proposed

2    collective bargaining agreement is

3    submitted to the membership, you receive

4    a copy of that?

5          A.     Repeat the question, please?

6          Q.     I'll ask you another one.

7    When a collective union bargaining

8    agreement is finalized for a fixed

9    period of time, do you as a collective

10   bargaining unit member receive a copy of

11   that final agreement?

12         A.     Yes.

13         Q.     And that's an important

14   document, isn't it?

15         A.     Yes.

16         Q.     It governs a lot of the

17   rights and responsibilities between you

18   and your employer; isn't that right?

19         A.     Right.

20         Q.     And neither Deputy Chief

21   Giampaolo or Field or Chief Field are

22   members of the bargaining unit; isn't

23   that right?

24         A.     Not now.

25         Q.     When they were firefighters

24

1     but in their position as chief and

2     deputy chief, they're not part of the

3     union; is that correct?

4          A.     They were at the time of

5     the -- the acting deputy was still in

6     the bargaining unit at the time of the

7     promotional process.

8          Q.     But he was a -- when he was

9     vested as deputy chief, he wasn't part

10    of the unit, right?

11         A.     No.

12         Q.     And the collective

13    bargaining agreement sets forth the

14    rules for promoting individuals; isn't

15    that true?

16         A.     The bargaining unit and the

17    City of Torrington set rules.

18         Q.     And all of those rules are

19    in the collective bargaining agreement;

20    isn't that true?

21         A.     Sure.

22         Q.     Right.  So all of the rules

23    pertaining to promotion are within the

24    collective bargaining agreement for the

25    given term of that agreement; isn't that

25

```
 1      right?

 2            A.     True.

 3            Q.     And they're, typically those

 4      agreements last for two or three or four

 5      years; isn't that right?

 6            A.     Correct.

 7            Q.     And you told me that you

 8      didn't know whether Deputy Chief or the

 9      position of -- let me withdraw that.

10      Does the position of deputy chief hold

11      any special power or privilege to

12      promote an individual?

13            A.     No.

14            Q.     What about the position of

15      chief?  Does the chief, that position,

16      regardless by whom its occupied, hold

17      any special power or privilege to

18      promote an individual from one rank to

19      another?

20            A.     No.

21            Q.     Okay.  We were talking about

22      your reputation and you said that you've

23      suffered -- some jokes have been made

24      because you weren't promoted.  How does

25      that effect you?
```

26

1        A.     Doesn't feel very good.

2        Q.     And humiliation, how is that

3   an element of your damages?

4        A.     I just feel totally

5   humiliated that that evening I met the

6   job description and I came out number

7   one and I wasn't chosen and they

8   wouldn't give me an answer as to why I

9   wasn't chosen and anything like that, so

10  I feel humiliated.

11       Q.     Do you believe that the

12  Board of Public Safety had discretion to

13  promote whomever they wanted on the

14  promotion list on the night in question?

15       A.     Yes.

16       Q.     So it's your testimony that

17  the Board of Public Safety had the

18  discretion to promote anyone on that

19  list regardless of the order in which

20  they were ranked; is that correct?

21       A.     Correct.

22       Q.     Now, other than the injures

23  that you described as I will for lack of

24  a better word say medical injuries, have

25  you suffered any other injuries as a

27

```
 1        result of your claim that you were not

 2        promoted on July 11th, 2001?

 3             A.      Injuries meaning physically?

 4             Q.      Other than physical injuries

 5        and medical-type injuries?

 6             A.      I'm not sure I understand

 7        what you mean by injury.

 8             Q.      Have you suffered -- I'll

 9        say damages.  Have you suffered any

10        other sort of damages?

11             A.      The only other damages I can

12        recall would be economic loss, money

13        between the time --

14             Q.      Can you tell me how much --

15        can you describe for me this economic

16        loss that you claim to have suffered?

17             A.      If I were to be promoted

18        that evening, I would have been making

19        captain's pay.

20             Q.      I understand that, but I

21        don't know anything about the pay

22        structure of the City of Torrington Fire

23        Department and since you're claiming the

24        damages, I want to know from you, how

25        much you think you're entitled to.  So
```

28

1       please, tell me how much financial

2       damages you're entitled to as a result

3       of not being promoted on July 11th 2001?

4              A.    I can't give you an exact

5       number.  I'd have to sit down and figure

6       it to exact number.  $2,500.00 a year

7       maybe between lieutenant and captain

8       without overtime.  The money that would

9       have been contributed to my pension.

10      Some -- I can't remember the exact

11      amount of days without looking at my

12      documentation but I had to give up a

13      couple of days of part time work to go

14      to hearings and stuff, so I can't give

15      you an exact figure.

16             Q.    But you didn't think that it

17      was important to calculate that number

18      before bringing this lawsuit?

19             A.    No, because its been

20      continuous for two and a half years, so

21      I don't have a figure.

22             Q.    Now, you've participated in

23      hearings before the State Board of Labor

24      and Mediation; is that correct?

25             A.    Correct.

38

```
 1              Q.    It sounds like a declarative
 2        factual statement, doesn't it?
 3              A.    Uh-huh.  Yes.
 4              Q.    When you say uh-huh, you
 5        mean yes?
 6              A.    Yes.
 7              Q.    Okay.  Do you have, as you
 8        sit here today, any evidence that the
 9        Defendants met secretly on July 11th
10        2001 to determine who would be promoted?
11              A.    I would say in executive
12        session.
13              Q.    But you don't know what
14        would happen in executive session, do
15        you?
16              A.    No.
17              Q.    Okay.  So you have no
18        personal knowledge or any facts to
19        support that sentence that reads on July
20        11th the Defendants met secretly to
21        determine who would be promoted to fill
22        two vacancies to the position of captain
23        in the Torrington Fire Department, do
24        you?
25              A.    Well, I wasn't unaware that
```

39

1    contacting Deputy Chief Giampaolo was in

2    there.

3        Q.    Okay.  Did you understand my

4    question?

5        A.    Yes, that's my answer to it.

6        Q.    My question called for a yes

7    or no answer.  Do you have any evidence

8    or facts to prove that on July 11, 2001

9    the Defendants met secretly to determine

10   who would be promoted to fill two

11   vacancies to the position of captain in

12   the Torrington Fire Department.  Yes or

13   no?

14       A.    Yes.

15       Q.    What is the evidence that

16   they met secretly on that date?

17       A.    That after the executive

18   session, Mr. Giampaolo walked out of the

19   executive session.

20       Q.    So is it your testimony that

21   it was improper to have Deputy Chief

22   Giampaolo in executive session?

23       A.    Right.

24       Q.    What's the basis for your

25   position that having Deputy Chief

40

```
 1          Giampaolo in executive session in the

 2          Board of Public Safety?

 3              A.     He tested for the same

 4          position as I did.

 5              Q.     And you belief that violates

 6          some rule or regulation?

 7              A.     I believe it's unethical.

 8              Q.     And that's your claim that

 9          there was a secret meeting, that there

10          was an executive meeting with Deputy

11          Chief Giampaolo?

12              A.     Yes.

13              Q.     Now, paragraph 14 it says

14          the Defendants never gave the Plaintiff

15          any opportunity to be heard or to

16          address any reasons they may have had

17          for denying him the promotion to which

18          he was entitled.   Do you see that?

19              A.     What was the number, please?

20              Q.     Paragraph 14.

21              A.     Thank you.  Yes, I see that.

22              Q.     And it's your testimony that

23          you've never been able to air your

24          displeasure with the decision of the

25          Board of Public Safety; is that right?
```

41

```
1            A.     Correct.
2            Q.     And you haven't had an
3     opportunity to address the Board of
4     Public Safety?
5            A.     Correct.
6            Q.     Have you addressed your
7     concerns with anybody else?
8            A.     Yes.
9            Q.     With whom have you addressed
10    your concerns?
11           A.     Chief Field.
12                  MR. RADSHAW:  Can you
13        mark this as the next exhibit.
14
15     (Defendants' Exhibit No. 3, memorandum
16          dated 7/12/01, marked for
17               identification.)
18
19           Q.     (By Mr. Radshaw) I'm showing
20    you a document, Mr. McElroy, I believe
21    it's marked as Defendants Exhibit 3.
22    It's two pages long.  It's dated
23    July 12, 2001 and it's on the letterhead
24    of the head of the Department, Fire
25    Service City of Torrington and on the
```

42

1          second page are the typewritten words

2          John B. Field, Junior.  There's a

3          signature above it and it's addressed to

4          Lieutenant Joseph McElroy.  Have you

5          seen this document before?

6                  A.      Yes.

7                  Q.      And it's addressed to you;

8          is it not?

9                  A.      Yes.

10                 Q.      And you're familiar with the

11         signature of Chief Field?

12                 A.      Yes.

13                 Q.      And that's his signature

14         that appears on the second page?

15                 A.      Yes.

16                 Q.      And this letter was received

17         by you?

18                 A.      Yes.

19                 Q.      When did you receive it?

20                 A.      I don't recall the exact

21         date.

22                 Q.      But it would have to be on

23         July 12th 2001 or after; isn't that

24         correct?

25                 A.      Yes.

43

1          Q.     Read the last sentence of

2     that letter.  It says, "Please, stop by

3     at any time to discuss this or any other

4     matter you would like."

5          A.     Yes.

6          Q.     Did you take that

7     opportunity up with Chief Field?

8          A.     Yes.

9          Q.     When?

10          A.     I don't recall the exact

11     date.

12          Q.     Do you recall after

13     receiving that letter whether or not you

14     arranged a meeting with Chief Field,

15     yourself and Pat Doyle?

16          A.     Yes.

17          Q.     Do you have a recollection

18     when that meeting might have taken

19     place?

20          A.     I do not recall the exact

21     date.

22          Q.     Do you think it might have

23     been on August the 9th, 2001?

24          A.     August the 9th?

25     I don't know.

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

44

1          Q.     If I thought that was the

2      date, would you have any reason to

3      disagree with me?

4          A.     No.

5          Q.     Do you remember what

6      occurred at that meeting?

7          A.     Yes.

8          Q.     Please, describe to me what

9      occurred at that meeting with Chief

10     Fields, yourself and Pat Doyle?

11         A.     Pat Doyle was my union

12     representative because I went into the

13     Chief's office and I went in to the

14     Chief and asked him why I was bypassed

15     for the promotion and he told me that he

16     could not tell me.  Could not give me a

17     reason why I was bypassed.

18         Q.     Is that all that happened?

19         A.     Without seeing the document,

20     I don't remember every word.

21         Q.     Do you recall what else

22     happened?

23         A.     The Chief stated -- I

24     believe he said -- I asked him if he

25     made a recommendation and he said I

45

1       didn't want to make a recommendation

2       because I didn't want to make it look

3       like I was picking my buddy, I believe

4       that's what was said.

5            Q.     Did he tell you that he

6       answered questions from the Board of

7       Public Safety about the candidates?

8            A.     I don't recall that.

9            Q.     Now, after that meeting --

10                  MR. RADSHAW:  Mark that

11          as the next exhibit.

12

13      (Defendants' Exhibit No. 4, grievance

14         letter dated 8/143/01, marked for

15                 identification.)

16

17           Q.     (By Mr. Radshaw) You filed a

18      grievance, didn't you?

19           A.     Correct.

20           Q.     The document that I'm

21      showing you is marked as Defendants

22      Exhibit 4, there's a typewritten

23      signature there, it says Joseph A.

24      McElroy and there's a signature above

25      it.  Is that yours?

46

1          A.      Yes.

2          Q.      Did you type up this

3     document?

4          A.      Yes.

5          Q.      And you signed it?

6          A.      Yes.


7          Q.      And you did it on August

8     14th, 2001?

9          A.      Correct.

10         Q.      And you forwarded it to the

11    grievance committee; is that correct?

12         A.      Yes.

13         Q.      And the grievance committee

14    forwarded it to the chief; is that

15    correct?

16         A.      I believe so.

17               MR. RADSHAW:   Mark this

18      please.

19

20    (Defendants' Exhibit No. 5, letter dated

21       8/24/01, marked for identification.)

22

23         Q.      (By Mr. Radshaw) The

24    document I'm showing you is Defendants'

25    Exhibit 5.   Have you seen that document

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut   06108
(860) 291-9191     FAX:  (860) 528-1972

47

```
 1        before?

 2             A.     I don't believe so.

 3             Q.     You see where the

 4        typewritten words are Michael Zavatkay,

 5        Z-A-V-A-T-K-A-Y?  Do you see the

 6        signature above it?

 7             A.     Yes.

 8             Q.     Are you familiar with his

 9        signature?

10             A.     I believe so.

11             Q.     Is that his signature?

12             A.     I believe it is.

13             Q.     Do you see below that

14        there's another signature?  Do you

15        recognize that one?

16             A.     It appears to be Chief

17        Field.

18             Q.     And you're familiar with the

19        Chief's signature?

20             A.     Yes.

21             Q.     And this is the grievance

22        that your union filed with the

23        Department on behalf of your claim for

24        promotion; is that correct?

25             A.     Correct.
```

48

```
1          Q.     And what was the disposition
2     of that grievance at that stage?
3          A.     I'm not sure I understand
4     the question.
5          Q.     Well, was your grievance
6     sustained?
7          A.     They denied the grievance.
8     Yes.
9          Q.     And following that denial,
10    you took additional steps; isn't that
11    right?
12         A.     Yes.
13         Q.     And that includes you and
14    your union going to the State Board of
15    Labor and Mediation; is that right?
16         A.     Yes.
17         Q.     And that matter had been
18    pending before that board for some time,
19    hasn't it?
20         A.     Yes.
21         Q.     In fact, there was recently
22    a hearing on November 4th; isn't that
23    right?
24         A.     Correct.
25         Q.     And no decision has been
```

49

1       reached yet, has it?

2               A.      No.

3               Q.      Do you have any idea when a

4       decision will be reached?

5               A.      I don't know.

6               Q.      But its fair to say that

7       your grievance is still pending in the

8       administrative remedies on its way to

9       the State Board of Labor and Mediation;

10      isn't that correct?

11              A.      Correct.

12              Q.      And you haven't got a final

13      answer from them at all, have you?

14              A.      No.

15                      MR. RADSHAW:  Would you

16          mark that as the next exhibit.

17

18      (Defendants' Exhibit No. 6, letter dated

19          8/10/01, marked for identification.)

20

21              Q.      (By Mr. Radshaw) Mr.

22      McElroy, I'm showing you a document

23      that's been marked as Defendants'

24      Exhibit 6.  Do you recognize that

25      document?

50

```
1          A.     Yes.
2          Q.     Did you create that
3   document?
4          A.     Yes.
5          Q.     Is that your signature?
6          A.     Correct.
7          Q.     And you've addressed it to
8   the Freedom of Information Commission on
9   Trinity Street in Hartford?
10         A.     Yes.
11         Q.     Did you put that in the
12  mail?
13         A.     Yes.
14         Q.     Have you had any response
15  from the Freedom of Information
16  Commission?
17         A.     Yes.
18         Q.     And what did they say?
19         A.     They believe that the Board
20  did not hold an illegal executive
21  session I believe.
22         Q.     So another way of saying
23  that is the Freedom of Information
24  Commission did not believe your claim
25  and concluded the Board held a proper
```

51

```
1         executive session; is that correct?
2              A.    I believe so.
3              Q.    Okay.  Now, are you claiming
4         as part of your lawsuit that this
5         executive session that you describe here
6         in this letter injured you?
7              A.    That the letter injured me?
8              Q.    I'm sorry.  The executive
9         session.  Your claim of illegal
10        executive session, is that a claim
11        you're making in this lawsuit?
12             A.    Yes.
13             Q.    Even though the Freedom of
14        Information Commission concluded it was
15        a proper and legal meeting?
16             A.    Correct.
17             Q.    Okay.  Now, turning back to
18        the complaint on paragraph 15, the
19        second part of paragraph 15 I'm
20        paraphrasing says, the Defendants led
21        him to believe that they, in fact, would
22        promote him on July 11th 2001.  Tell me
23        all the ways that Chief Field you
24        believe led you to believe that you
25        would be promoted on that day?
```

52

```
 1          A.     Based on the letters that

 2   he's written for me, the comments and

 3   remarks he's made to me over the years,

 4   the times I've asked to be evaluated by

 5   him that I'm doing what I need to do and

 6   I'm doing my job.

 7          Q.     Did Chief Field ever say to

 8   you Joe, you're going to be promoted the

 9   next time your name is on the list?

10          A.     I believe -- yes, the Chief

11   said to me trust me, you're gonna be

12   promoted and I asked him what did I do

13   wrong this time to not be promoted.

14   You're not listening to me, trust me

15   you're gonna be promoted.

16          Q.     Did he say -- when did the

17   Chief make this, "trust me," statement?

18          A.     After July 11th 2001.  I

19   don't recall the exact date.

20          Q.     But you're telling me as we

21   sit here today that Chief did not say

22   trust me, you're going to be promoted

23   prior to July 11, 2001; is that correct?

24          A.     No, not the word trust me.

25          Q.     Did he ever explicitly
```

53

1    promise after your name appeared on the

2    available promotion list for the

3    promotion list that was considered at

4    the July 11th meeting, did Chief ever

5    explicitly promise to you that you'd be

6    promoted at that meeting?

7         A.    No.

8         Q.    What about Deputy Chief

9    Giampaolo, did Deputy Chief Giampaolo

10   ever expressly promise to you that you

11   would be promoted on July 11th, 2001

12   prior to that meeting?

13        A.    No.

14        Q.    And, in fact, the first

15   section -- I'll withdraw that.  Now,

16   paragraph 16 it says the Defendants to

17   this day have never advised the

18   Plaintiff of their reasons for denying

19   him promotion despite requests for

20   statement and reasons.   Do you see

21   that?

22        A.    Yes.

23        Q.    You remember Defendants'

24   Exhibit 3, correct?  And in Defendants'

25   Exhibit 3 Chief Field writes with the

54

```
 1        Department's current recent problems,

 2        difficult situations would need to be

 3        made to assure the appropriate personnel

 4        were in positions directing the

 5        transition.

 6             A.    Yes, I do.

 7             Q.    And you see as you're aware

 8        not all decisions are popular and this

 9        is the first of many I will need to

10        follow?

11             A.    Yes.


12             Q.    And you see that the Board

13        of Public Safety set the standard from

14        what it wants from its fire department

15        placing field in a position not leader

16        do you see that?  It's in the middle

17        paragraph?

18             A.    Yes.

19             Q.    And those don't provide any

20        reasons for you not being promoted?

21             A.    Provide any reasons to me?

22             Q.    Right.

23             A.    No.

24             Q.    They're not satisfactory

25        reasons, are they?
```

55

1        A.      No.

2        Q.      And what about that meeting

3    you had on August 9, 2001 when the Chief

4    told you that the Board of Public Safety

5    developed a profile over the captains

6    they wanted and that they chose other

7    people and not you, that's not a reason?

8        A.      The Chief never told me they

9    developed a profile for the candidates,

10   he just stated two guys are going to be

11   upset with me.

12       Q.      The chief didn't explain to

13   you that the Board of Public Safety was

14   developing an evaluation system?

15       A.      No.

16       Q.      And he didn't explain to you

17   that developing that evaluation system

18   was to produce a better understanding of

19   the potential candidate?

20       A.      No.

21       Q.      The next paragraph,

22   paragraph 17 of the complaint, the

23   Defendants to this day have never

24   afforded the Plaintiff any opportunity

25   to be heard respecting the denial of his

56

```
1          right to promotion despite request for

2          such a hearing; is that correct?

3               A.    Correct.

4               Q.    Now, have you testified at

5          any of the Board of Labor and Mediation

6          hearings since the time you filed your

7          grievance?

8               A.    At the last one, November

9          4th.

10              Q.    But you testified, didn't

11         you?

12              A.    Yes.

13              Q.    And you did have a meeting

14         with Chief Field before you filed your

15         grievance; isn't that right?

16              A.    Correct.

17              Q.    Were there any other

18         hearings between the denial of your

19         grievance and the State Board of Labor

20         and Mediation hearing in which you

21         testified about where you testified --

22         that was a bad question.

23              A.    I'm not sure you understand.

24              Q.    You had a meeting with the

25         Chief in August of 2001; isn't that
```

57

1      right?

2             A.     Correct.

3             Q.     And you testified to the

4      State Board of Labor and Mediation about

5      the subject matter of this lawsuit not

6      being promoted, correct?

7             A.     On November 4th.

8             Q.     Right.  In between that

9      August 9, meeting and the November 4th

10     meeting did you state air your grievance

11     in a forum in any other context in

12     connection with -- were there any

13     other -- let me withdraw that.

14            A.     There were other hearings.

15            Q.     Did you testify at any of

16     them?

17            A.     No, I did not.

18            Q.     Were there any other

19     meetings at the City of Torrington

20     concerning your grievance other than

21     meeting with the chief on August 9th?

22            A.     No.

23            Q.     Do you know Kevin Hayes?

24            A.     Yes, I do.

25            Q.     How long have you known

58

1    Kevin Hayes?

2           A.     Since I got on the job.

3           Q.     Kevin Hayes scored number

4    two and was the second person in line

5    for promotion; isn't that right?

6           A.     No.

7           Q.     Are you aware that Kevin

8    Hayes has brought a lawsuit?

9           A.     Yes.

10          Q.     And are you aware that a

11   lawsuit is pending in the Federal

12   District Court here in Connecticut?

13          A.     Yes.

14          Q.     And you know that that

15   lawsuit is pending before Judge Kravitz?

16          A.     I don't know what Kevin's

17   lawsuit is.

18          Q.     Have you talked to Kevin

19   about filing a lawsuit?

20          A.     Yes.

21          Q.     Without asking you any

22   conversations you had with your

23   attorney, who suggested that you file a

24   lawsuit?

25          A.     Nobody.

59

1           Q.     No one, you just decided to

2      do it yourself?

3           A.     Yes.

4           Q.     No one at the fire

5      department suggested it was something

6      you should do?

7           A.     No.

8           Q.     We've already covered the

9      economic loss listed in paragraph 21.

10     Do you see that?

11          A.     Yes, sir.

12          Q.     You thought the pay

13     differential might be about $2,500.00 a

14     year?

15          A.     Minimum.

16          Q.     Other than your complaint to

17     the Freedom of Information Act

18     Commission, other than your grievances,

19     have you filed a complaint or charge

20     with any other state or federal agency

21     in reference to your failure to be

22     promoted?

23          A.     I don't believe so.

24          Q.     And we already covered this

25     a little bit earlier, you haven't

60

1              received any treatment from any doctor

2              as a result of the humiliation, stress,

3              injury to your reputation and

4              depression, have you?

5                   A.      No.

6                   Q.      You're not taking any

7              medication, are you?

8                   A.      No.

9                   Q.      As you sit here, do you

10             suffer from any condition that prevents

11             you from testifying truthfully or

12             accurately?

13                  A.      No.

14                  Q.      And you're not taking any

15             medication at all today, are you?

16                  A.      No.

17                  Q.      So you don't have any

18             expenses for medical bills or anything

19             like that as a result of injuries you

20             claim to have suffered; isn't that

21             right?

22                  A.      No.

23                  Q.      I suspect you have a fee

24             agreement with the law firm of Williams

25             and Pattis; is that correct?

61

```
 1              A.     Yes, there's an agreement.

 2              Q.     Could you, please, explain

 3         to me the nature of your fee agreement

 4         with the law firm?

 5                     MS. BROOKS:  I'm going to

 6              object to that.

 7                     THE WITNESS:   I

 8              don't know the whole thing off

 9              the top of my head.

10              Q.     (By Mr. Radshaw) Did you pay

11         them a retainer to take your case?

12              A.     Yes.

13              Q.     How much did you pay them?

14                     MS. BROOKS:  I'm going to

15              object to that question.

16                     THE WITNESS:   I

17              don't recall.

18                     MR. RADSHAW:

19              Would you mark this as the

20              next one.

21

22         (Defendants' Exhibit No. 7, request for

23          interrogatories dated 9/22/03, marked

24                for identification.)

25
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

62

```
 1                   MS. EPSTEIN:  Would this

 2           be a good time for a break?

 3                   MR. RADSHAW:

 4           We'll take a five-minute

 5           break.

 6

 7           (A break was taken at 11:12 a.m.)

 8           (Deposition resumed at 11:20 a.m.)

 9

10           Q.    (By Mr. Radshaw) Back on the

11      record.   Mr. McElroy, I'm showing you a

12      document there in front of you marked

13      Defendants' Exhibit 7.   Have you ever

14      seen that document before?

15           A.    Yes.

16           Q.    When was the first time you

17      saw that document?

18           A.    I don't recall the exact

19      date.

20           Q.    Okay.  Well, it's the

21      Defendants' first set of interrogatories

22      and request for production of Plaintiff

23      and it's dated September 22, 2003.   Do

24      you see that?

25           A.    Yes.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

63

1           Q.      Did you see it before that

2      date?

3           A.      I don't believe so.

4           Q.      You couldn't have because it

5      wasn't created, right?  Now, did you see

6      it in the month of September?

7           A.      I believe so.

8           Q.      Is it's your testimony

9      you've had this document in your

10     possession since at least October 1st;

11     is that fair?

12          A.      Yes.

13          Q.      Have you made any effort to

14     answer the interrogatories in that

15     document?

16          A.      Yes.

17          Q.      Are they completed?

18          A.      Yes, I believe so.

19          Q.      And what about the requests

20     for production of documents.   Have you

21     produced documents as well?

22          A.      I have produced documents.

23          Q.      And you gave them all to

24     your lawyer?

25                  MR. RADSHAW:  Mark those,

64

1          please.

2

3                  (Defendants' Exhibit Nos. 8-9,

4           agreements, marked for identification.)

5

6                  Q.     (By Mr. Radshaw) We're

7          showing you Defendants' Exhibit 8 is the

8          agreement between Local 1567 A.I.F.F

9          A.F.L - C.I.O and the City of Torrington

10         1995 through 1997.  Do you see that?

11                 A.     Yes, I do.

12                 Q.     You're a member of Local

13         1567, aren't you and you're a member of

14         the I.A.F.F. A.F.L - C.IO, aren't you?

15                 A.     Yes.

16                 Q.     And Defendants' Exhibit 9 is

17         the same agreement with the same title

18         but covering the years 1997 through

19         2001; is that correct?

20                 A.     Yes, it is.

21                 Q.     In your capacity as a member

22         of -- withdraw that.  Would it be fair

23         to say that these two documents govern

24         the relationship between the City of

25         Torrington and the firefighters who were

65
```
 1        a member of the bargaining unit; is that

 2        correct?

 3               A.      Yes.

 4               Q.      And in your capacity as a

 5        member of Local 1567, you've seen these

 6        documents before, haven't you?

 7               A.      Yes.

 8               Q.      Okay.   Because there is

 9        important provisions in these documents;

10        isn't that right?

11               A.      Yes.

12               Q.      And some of those provisions

13        include the grievance procedure, right?

14               A.      Yes.

15               Q.      And holiday leave; isn't

16        that right?

17               A.      Yes, sir.

18               Q.      And the definition of the

19        work week; is that correct?

20               A.      Right.

21               Q.      And sick leave, right?

22               A.      Yes.  Yes, sir.

23               Q.      And it also includes

24        insurance, correct?

25               A.      Yes, sir.
```

66

1          Q.     And it also sets the wages,

2     correct?

3          A.     Yes, sir.

4          Q.     Okay.  And turning to what

5     looks to be Page 49?

6          A.     I don't have 49, sir.

7          Q.     We're starting with

8     Defendants' Exhibit 8.  My apologies.

9          A.     Sorry.  Okay.

10          Q.     That is Article 29.  You see

11     that, appointments and promotions?

12          A.     Yes, sir.

13          Q.     And would it be fair to say

14     that this section of the collective

15     bargaining agreement covers appointments

16     and promotions?

17          A.     Yes.

18          Q.     Now, let's read the first

19     sentence in Section 1 the sentence in

20     Section 1 says, all promotions and

21     appointments to the Department shall be

22     made by the Board of Public Safety; is

23     that correct?

24          A.     Correct.

25          Q.     It doesn't include the chief

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191     FAX:  (860) 528-1972

67

```
1        and the deputy chief appointing

2        authorities, does it?

3             A.    No.

4             Q.    It says just by the Board of

5        Public Safety, right?

6             A.    Right.

7             Q.    Okay.  Now, turning from

8        section little A to it looks like we may

9        have a page missing.  Do you have little

10       A, little B and little C?   It goes to

11       D.

12            A.    Yes, sir.

13            Q.    I'm going to pull my page

14       out because it looks like we've got a

15       missing page and I'll give that to you,

16       there's little B and little C, right?

17            A.    Yes.

18            Q.    And you agree with me on the

19       bottom of that page its Page 50?

20            A.    Yes.

21            Q.    So it looks like the exhibit

22       that you have just might have been

23       missing Page 50 and we'll --

24            A.    Correct.

25            Q.    On Page 50 it -- from little
```

68

1        A through little D, that covers the

2        scoring; isn't that correct?

3             A.     Correct.

4             Q.     Okay.   And you're not

5        claiming that there's been any error in

6        scoring; is that correct?

7             A.     Correct.

8             Q.     And you're not claiming that

9        there was any weighing issues as set

10        forth in subsection C 1, 2 and 3; is

11        that correct, that would be on Page 51,

12        correct?

13             A.     What was the question on

14        that?

15             Q.     You're not claiming that

16        your score was improperly weighed or

17        calculated, are you?

18             A.     No, sir.

19             Q.     You're not claiming that the

20        final passing scores were not posted on

21        the bulletin board for five calendar

22        days, are you?

23             A.     No, sir.

24             Q.     Now, turning your attention

25        to little E in Section 1 of Article 29

69

```
 1          it says the top four applicants names

 2          shall be submitted to the Board of

 3          Public Safety in order of their scores

 4          and said Board of Public Safety shall

 5          select any one of said candidates and

 6          appoint to the position forthwith.  Do

 7          you see that?

 8              A.     Yes, sir.

 9              Q.     Now, lets start with the

10          first part.  Isn't it true that the

11          names eligible on the promotion list

12          that were considered at the Board of

13          Public Safety meeting on July 11, 2001

14          were, in fact, submitted in order of the

15          scores?

16              A.     Yes.

17              Q.     Okay.  So the board -- the

18          names were properly submitted in proper

19          order; isn't that right?

20              A.     I wasn't in executive

21          session but to my knowledge they were.

22              Q.     Did you ever see a document

23          that listed the names?  Don't worry,

24          it's not here.

25              A.     I don't recall.
```

70

```
1           Q.    Okay.  But you're not
2     claiming that was a problem?
3           A.    No.
4           Q.    Now, the next part of
5     Section 1E of Article 29 says the Board
6     of Public Safety shall select any one of
7     said candidates; isn't that right?
8           A.    Yes, sir.
9           Q.    It doesn't say it should
10    select the top candidate, does it?
11          A.    No.
12          Q.    It doesn't say that it
13    should select the second or third or
14    fourth, does it?
15          A.    No, sir.
16          Q.    It says any one of them?
17          A.    Correct.
18          Q.    And also it says the Board
19    of Public Safety shall select, not the
20    chief, does it?
21          A.    Correct.
22          Q.    Okay.  And it doesn't say
23    the chief shall select one or more of
24    the candidates, does it?
25          A.    Correct.
```

71

1          Q.     And it doesn't say the

2     deputy chief should select one or more

3     of the candidates?

4          A.     Correct.

5          Q.     Okay.   Turning your

6     attention to Exhibit 9 and it looks like

7     Exhibit 9 is missing a page as well.

8     It's missing Page 44.   Now, we're

9     talking about Exhibit 9 that's the

10    agreement that governs the time period

11    of 1997 through the end of 2001; isn't

12    that correct?

13         A.     Correct.

14         Q.     So this would be the

15    governing document for the promotion

16    that was in issue on July 11, 2001;

17    isn't that right?

18         A.     Yes.

19         Q.     And just like the Exhibit A,

20    this document covers manpower

21    assignment, salaries, vacation, sick

22    leave and grievance procedure among

23    other things, correct?

24         A.     Yes.

25         Q.     And this document governs

72

1     how appointments and promotions met;

2     isn't that right?

3              A.     Right.

4              Q.     And that would have been

5     Article 29 on Page 41.   It starts

6     there, I'm sorry.

7              A.     Yes.

8              Q.     And just like in Exhibit 8

9     Section 1 says that all promotions and

10    appointments to the Department shall be

11    made by the Board of Public Safety,

12    isn't that right?

13             A.     Yes, sir.

14             Q.     And it does not say the

15    chief makes appointments, does it?

16             A.     No, sir.

17             Q.     And it does not say the

18    deputy chief makes appointments, does

19    it?

20             A.     No, sir.

21             Q.     And just like the provisions

22    that we've discussed in connection with

23    Exhibit A, you're not challenging the

24    calculation or the weighing of the

25    scores, are you?

73

1         A.      No, sir.

2         Q.      And you're not challenging

3    whether the scores were posted on a

4    bulletin board long enough, are you?

5         A.      No, sir.

6         Q.      But in Section 1, little E

7    it says right there, "The top four

8    candidates names shall be submitted to

9    the Board of Public Safety in order of

10   their scores." Do you see that?

11        A.      Yes, sir.

12        Q.      And you do not claim that

13   the names were submitted in an improper

14   order, do you?

15        A.      No, sir.

16        Q.      And it says right there the

17   Board of Public Safety shall select any

18   one of said candidates and appoint to

19   the position forthwith, correct?

20        A.      Yes, sir.

21        Q.      And this document does not

22   say it should select the candidates in

23   order of their scores, does it?

24        A.      No, sir.

25        Q.      And it does not say it

74

```
 1          should select one before the other, does
 2          it?
 3               A.    No.
 4               Q.    This language says the board
 5          can select any one of four irrespective
 6          of their scores, doesn't it?
 7               A.    Correct.
 8               Q.    Okay.  Mr. McElroy, I turn
 9          your attention back to Exhibit 4.   This
10          is an exhibit you wrote, correct?
11               A.    Correct.
12               Q.    We already covered that.
13          We already covered past practice in our
14          discussions today; isn't that right?
15               A.    I believe so.
16               Q.    Your definition of past
17          practice was because the Board of Public
18          Safety has always promoted in order of
19          the test scores, that's the past
20          practice that you believe they deviated
21          from in your instance; isn't that
22          correct?
23               A.    All the number one top
24          scoring.  Yes.
25               Q.    What about number two, did
```

75

1          they always promote number two as well?

2                  A.      Yes, I believe so.

3                  Q.      Other than that past

4          practice you've just described, are

5          there any other past practices that you

6          claim to be part of your lawsuit?

7                  A.      I believe the past practice

8          of making a recommendation from the

9          chief.

10                 Q.      Okay.   So it's your claim

11         that the chief -- that Chief Field

12         violated your civil rights when he

13         failed to make a recommendation; is that

14         correct?

15                 A.      Correct.

16                 Q.      You're not claiming that

17         your civil rights were violated because

18         he didn't recommend you, but that he

19         made no recommendation at all; is that

20         correct?

21                 A.      I can't really answer that,

22         I don't know the law.

23                 Q.      I understand that, but I

24         want to understand what your claim is.

25         You just told me that one of past

76

1          practices that you believe was departed

2          from, was we'll call the Chief's

3          recommendation; is that fair to say?

4                A.     Sure.

5                Q.     Okay.  And what I want to

6          understand is, is your claim that the

7          departure from past practices was the

8          Chief not making any recommendation at

9          all or not recommending you?

10               A.     Not making a recommendation.

11               Q.     At all, of anyone; is that

12         right?

13               A.     Of anyone.

14               Q.     So if the Chief had

15         recommended say Kevin Hayes instead of

16         you, would you still be claiming that

17         the Chief's failure to make a

18         recommendation was part of your lawsuit?

19               A.     I can't answer that.

20               Q.     Why not?

21               A.     Because all the

22         circumstances involved.

23               Q.     I'm trying to understand

24         since Chief Field has only been the

25         chief for maybe even it was only a year,

77
```
 1        it wasn't even a year at that time.

 2        Past practice is something that goes

 3        back over a number of years; isn't that

 4        right?

 5            A.    Uh-huh. (The witness nods.)

 6            Q.    When you nod your head up

 7        and down, you mean yes?

 8            A.    Yes.

 9            Q.    I want to understand what

10        this past practice was with regard to

11        the chief's recommendation?

12            A.    Okay.

13            Q.    So I want you -- and you've

14        told me a couple of different things and

15        I'm trying to understand what it really

16        is that you're claiming and based on

17        what you've told me, I think they fall

18        into three categories and I want to

19        describe them to you and then I want you

20        to tell me which is it or of them you're

21        claiming?

22            A.    Okay.

23            Q.    It seems to me that you've

24        told me that you believe your rights

25        were violated when the Chief failed to
```

78

1     make any recommendation at all for any

2     of the candidates; is that correct?

3          A.     Correct.

4          Q.     Okay.  And is it also your

5     claim that the Chief violated your

6     rights when he failed to recommend you?

7          A.     Correct.

8          Q.     Okay.  Now, what I want to

9     understand is if the Chief had

10    recommended somebody else let's say

11    Kevin Hayes, would you still claim that

12    your rights were violated because the

13    Chief failed to recommend you?

14              MS. BROOKS:  I'm going to

15         object to the form of that

16         question.

17              THE WITNESS:

18         Like I said before, there's so

19         many circumstances involved in

20         it, I mean.

21         Q.     (By Mr. Radshaw) I'm trying

22    to understand because --

23         A.     Can I give you an answer?

24         Q.     Absolutely.

25         A.     Because I did come out

79
1     number one and I met the job description

2     and my personnel file speaks for itself,

3     I expected the Chief to do what past

4     chiefs an people have done to make a

5     recommendation of me.

6          Q.     And that -- and is it --

7     okay.  I think I know what you're

8     saying or let me try to describe it this

9     way.  So then is it your claim that the

10    past practice has been for the chief to

11    recommend the number one candidate, is

12    that your claim?

13         A.     Yes, sir.

14         Q.     So if you, for example, were

15    number two and Kevin Hayes was number

16    one, Kevin would have been entitled to

17    the chief's recommendation under your

18    version of past practices; is that

19    correct?

20         A.     I believe so.  Yes.

21         Q.     Now, on Exhibit 4 unjust

22    discrimination, what do you mean by

23    unjust discrimination?

24         A.     Being treated unfairly as to

25    every other stop scoring qualified

80

```
 1      candidate.

 2              Q.      Okay.   Now, if you're the

 3      stop scoring qualified candidate and

 4      Kevin Hayes, he was the second highest

 5      scoring candidate; isn't that right?

 6              A.      Yes.

 7              Q.      And he was passed over for

 8      promotion as well; isn't that right?

 9              A.      Yes.

10              Q.      How are you and Kevin's

11      positions different?

12              A.      Different in which way?  As

13      an officer or.

14              Q.      How are your claims

15      different?

16              A.      I don't know I'm just going

17      by my claim.

18                      MR. RADSHAW:  Mark this

19          as the next exhibit, please.

20

21      (Defendants' Exhibit No. 10, complaint

22          dated 8/28/02, marked for

23              identification.)

24

25              Q.      (By Mr. Radshaw) Mr.
```

81

1      McElroy, I'm showing you a document

2      that's been marked as Defendants'

3      Exhibit 10.  Do you see that there?

4           A.    Yes, sir.

5           Q.    Do you see the caption, it

6      says Kevin Hayes versus the City of

7      Torrington it has a docket number of

8      3:02CV01542?

9           A.    Yes.

10          Q.    And do you see that it is

11     dated August 28, 2002?

12          A.    Yes, sir.

13          Q.    And would you agree with me

14     that that was -- do you agree with me

15     that that was a document that was filed

16     near in time to your own lawsuit?

17          A.    Yes.

18          Q.    And isn't it true that both

19     you and Kevin share the same lawyer?

20          A.    Yes.

21          Q.    And that's the law firm of

22     Williams and Pattis?

23          A.    Yes, sir.

24          Q.    Let' start on the first page

25     and I'd like you to make reference to

82

```
1         Defendants' Exhibit 2 which is your

2         complaint; is that correct?

3              A.     Correct.

4              Q.     Before today, me showing you

5         Exhibit 10, have you ever seen that

6         document before?

7              A.     I don't believe so.

8              Q.     Let's look at paragraph 1 of

9         the complaint.  We'll start with the one

10        in Exhibit 10.   You see paragraph 1?

11             A.     Yes.

12             Q.     Now, turn and look at

13        Exhibit 2 and paragraph 1, they're

14        exactly the same, aren't they?

15             A.     Yes.

16             Q.     How about paragraph 2.

17        Paragraph 2 they're exactly the same as

18        well; isn't that correct?

19             A.     They appear to be.

20             Q.     Okay.  And I'm going to --

21        when I say they're exactly the same,

22        it's because of formatting.  There might

23        be words on different lines.  All the

24        exact words are in the same paragraph;

25        isn't that right?
```

83

1          A.      I'd have to read every

2     single one to know that.

3          Q.      Well, I'll tell you what,

4     why don't you read everything on

5     Exhibit 10 on the first page and then

6     compare it to Exhibit 2 and we'll go

7     from there.

8          A.      Okay.

9          Q.      Okay.  Mr. McElroy, we

10    covered paragraphs 1, 2 and 3.  Are they

11    exactly the same?

12         A.      Yes.

13         Q.      Let's turn to Page 2 of both

14    documents, paragraphs 4, 5 and 6.  Are

15    they exactly the same?

16         A.      (The witness complies.) The

17    words are a little, but yes, they do

18    appear to be the same.

19         Q.      Okay.  We'll start on

20    paragraph 7 on the bottom and turn the

21    page and go right down to paragraph 13.

22    Why don't you read those and tell me if

23    there are any differences and I will --

24    tell me if there are any differences.

25         A.      No. 8 just a little

84

1       different, second highest score and this

2       one says highest score.

3            Q.    And then would the other

4       difference be in paragraph 11?

5            A.    Yes.  This one is the first

6       and highest score and the other one is

7       the second highest score.

8            Q.    So to summarize, we're up

9       here through paragraph 13 on both

10      complaints, the one that's been marked

11      as Defendants' Exhibit 10, that's Mr.

12      Hayes's and the one that's been marked

13      as Defendants' Exhibit 2 is yours and

14      the only differences found so far is in

15      paragraph 8 of each complaint and Mr.

16      Hayes's complaint Exhibit 10 the

17      different part of paragraph 8 reads the

18      Plaintiff took the examination for that

19      position and received the second highest

20      score for all persons applying for that

21      position; is that correct?

22           A.    Not in number 10, no.

23           Q.    I'm sorry.  In number 8, in

24      paragraph 8.  Let me ask that question

25      again.  In Exhibit 10 which would be

85

```
1        the exhibit in your left hand in

2        paragraph 8, the only difference between

3        paragraph 8 in Exhibit 10 and paragraph

4        8 in Exhibit 2 is the sentence that

5        reads the Plaintiff took the examination

6        for that position and received the

7        second highest score of all persons

8        applying for that position; is that

9        correct?

10             A.     That's correct.

11             Q.     And that's because Mr. Hayes

12        did, in fact, score second; is that

13        correct?

14             A.     Yes.

15             Q.     And in Defendants' Exhibit 2

16        paragraph 8 the second portion reads he

17        took the examination for that position

18        and received the highest score of all

19        persons; is that right?

20             A.     That's right.

21             Q.     And that's because you did,

22        in fact, receive the highest score of

23        all people taking the test?

24             A.     Right.

25             Q.     And down in paragraph 11 we
```

86

1          have a similar difference.  In Exhibit

2          10 paragraph 11 it says for two set

3          vacancies there were four qualified

4          applicants of whom the plaintiff was the

5          second highest scoring.  Do you see

6          that?

7                    A.     Yes.

8                    Q.     And that was true because

9          Mr. Hayes was the second highest

10         scoring, correct?

11                   A.     Right.

12                   Q.     And the only difference in

13         Exhibit 2 in that same sentence was for

14         the said two vacancies there were four

15         qualified applicants of whom the

16         Plaintiff was the first and highest

17         scoring; is that correct?

18                   A.     Yes.

19                   Q.     And that's the only

20         difference up through paragraph 13; is

21         that correct?  Those are the two

22         differences we've identified so far; is

23         that correct?

24                   A.     Yes.

25                   Q.     Let's look through -- are

87

```
 1        you missing a page?

 2             A.    Yes.

 3             Q.    All right.  Here you go.

 4        Now, we're at paragraph 14 on through

 5        20.  Do we have any differences in the

 6        complaint from paragraphs 14 through 20

 7        in between Exhibits 10 and 2?  Have you

 8        had a chance to read from paragraphs 14

 9        to 20?

10             A.    Yes, sir.

11             Q.    And are there any

12        differences between those two?

13             A.    I don't see any.

14             Q.    And the paragraphs 21 and

15        22, they're exactly the same, aren't

16        they?

17             A.    They're the same.

18             Q.    They're the same so we've

19        identified the few instances but I want

20        to turn your attention to paragraph 20.

21        Now, remember a few minutes ago I asked

22        you how you thought or if you thought

23        your position was any different than

24        Kevin Hayes?  Do you recall that?

25             A.    Yes.
```

88

1          Q.     And we just had a little

2     exercise where we went through all the

3     allegations of your complaint and all

4     the allegations of his complaint are

5     exactly the same with the exception of

6     where it was alleged that you were the

7     highest scoring, it is alleged that Mr.

8     Hayes was the second highest scoring; is

9     that correct?

10          A.     Correct.

11          Q.     How is it that -- withdraw

12     that.  How is it that your claims are

13     different than Mr. Hayes given --

14               MS. BROOKS:  I'll object

15          to the form of that question.

16               MR. RADSHAW:  I'll

17          withdraw that question.  Would

18          you, please, explain to me the

19          basis of your objection?

20               MS. BROOKS:

21          You're asking him to tell you

22          legally what is the difference

23          between a complaint that he's

24          not involved with at all.

25               MR. RADSHAW:  Now,

89

```
 1              that's an objection.  What's

 2              the form of the question?

 3                   MS. BROOKS:  I'm

 4              objecting to the form.  If you

 5              want to depose me you can but

 6              that's my objection.

 7              Q.    (By Mr. Radshaw) Mr.

 8         Hayes -- Mr. McElroy, we've just gone

 9         through the complaints marked as

10         Exhibits 2 and 10 and the only relevant

11         difference between the two complaints is

12         that your complaint alleges that you're

13         the top scoring candidate, the highest

14         scoring candidate and his complaint

15         alleges that he's is the second highest.

16              And given your testimony earlier

17         today that you're familiar with Mr.

18         Hayes, you're friends with him for a

19         long time and you knew that he scored

20         second highest on the exam, how is Mr.

21         Hayes's position different from yours?

22              A.    I don't know.

23              Q.    Do you think he's in the

24         same situation as you?

25              A.    He may be.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

90

```
 1              Q.     I mean, he wasn't promoted;

 2      isn't that right?

 3              A.     Yes.

 4              Q.     And he was the second

 5      highest person; isn't that right?

 6              A.     Correct.

 7              Q.     And it's your testimony that

 8      the Department is always promoted in the

 9      order that people score; isn't that

10      right?

11              A.     No.   The first promotion

12      where we discussed with Avallone he was

13      promoted but they just chose him fourth

14      instead of third.   So my testimony isn't

15      everyone in order.

16              Q.     Is it your testimony that

17      every promotion has been made in order

18      at least for the top two scoring

19      candidates?

20              A.     Yes.

21              Q.     Okay.  So how is it that

22      your position is different from

23      Mr. Hayes?

24                   MS. BROOKS:  Again, I'm

25        going to object to the form of
```

91

1          that question.

2                    THE WITNESS:    I

3          don't know how its different,

4          I'm just going by what I'm

5          trying to accomplish.

6          Q.    (By Mr. Radshaw) You don't

7     know how its different.   Okay.  But you

8     wouldn't agree that both Mr. Hayes and

9     you are similarly situated; you were

10     both passed over for promotion?

11          A.    Correct.

12          Q.    And you were both passed,

13     both passed over for promotion in the

14     order in which your scores were

15     received?

16          A.    Correct.

17                    MR. RADSHAW:   I have no

18          further questions.   Attorney

19          Epstein, do you have any

20          questions?

21

22

23

24

25

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972