```
                                              1
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
        KEVIN HAYES                    NO. 3:02CV01542(CFD)
 3
        VS
 4
        CITY OF TORRINGTON, JAMES
 5      POTTER, CAROLANN KENNEDY,
        THOMAS TELMAN, ROBERT ZORDAN,
 6      KENNETH FUCHSMAN, CHRISTOPHER
        JANCO, JAYE GIAMPAOLO AND
 7      JOHN B. FIELD, JR.            NOVEMBER 13, 2003

 8
                   DEPOSITION OF KEVIN HAYES
 9
        APPEARANCES:
10
                WILLIAMS and PATTIS, LLC
11                  Attorneys for the Plaintiff
                    51 Elm Street, Suite 409
12                  New Haven, Connecticut  06510
                    (203) 562-9931
13
                BY:  KATRENA ENGSTROM, ESQUIRE
14

15              HOWD & LUDORF
                    Attorneys for Jaye Giampaolo &
16                  John B. Field, Jr.
                    65 Wethersfield Avenue
17                  Hartford, Connecticut  06114
                    (860) 249-1361
18
                BY:  JOHN J. RADSHAW, II ESQUIRE
19

20              HOWARD, KOHN, SPRAGUE & FITZGERALD, LLP
                    Attorneys for remaining Defendants
21                  237 Buckingham Street
                    Hartford, Connecticut  06126
22                  (860) 525-3101

23              BY:  CONSTANCE L. EPSTEIN, ESQUIRE

24
                   OKEEMAH S. HENDERSON
25      NOTARY PUBLIC-LICENSED SHORTHAND REPORTER
             CONNECTICUT LICENSE NO. 00333


        NIZIANKIEWICZ & MILLER REPORTING SERVICES
                      982 Tolland Street
             East Hartford, Connecticut  06108
        (860) 291-9191      FAX:  (860) 528-1972
```

# Exhibit E

2

1                           I N D E X

2        DEPONENT                                    PAGE

3

4        KEVIN HAYES

5

6        Direct Examination by Mr. Radshaw            4

7        Cross Examination by Ms. Epstein           131

8

9                    DEFENDANT'S EXHIBITS

10                  (For identification)

11

         EXHIBIT                                     PAGE
12
             1     Notice of deposition              11
13
             2     Responses to interrogatories      13
14
             3     Complaint dated 8/28/02           13
15
             4A  Grievance letter with attachments   57
16
             4B    Certificates                      60
17
             4C    Assignment on apparatus           60
18
             4D    Letter dated 2/22/96              60
19
             4E    Executive session meeting
20                 minutes                           60

21           4F    Code of Ethics-Chapter 22         65

22           5     Letter dated 7/12/01              84

23           6     Grievance letter dated
                   8/18/01                           87
24

25        *** EXHIBITS CONT'D
                ON PAGE 3

NIZIANKIEWICZ & MILLER REPORTING SERVICES
982 Tolland Street
East Hartford, Connecticut  06108
(860)  291-9191      FAX:  (860) 528-1972

```
                                                                    3
 1                              DEFENDANT'S EXHIBITS
                                 (For identification)
 2
          EXHIBIT                                           PAGE
 3

 4           7        Note dated 8/24/01                     93

 5           8        Agreement years '95 - '97              93

 6           9        Agreement years '97 - '01              93

 7          10        Complaint dated 8/26/02                93

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22        (Original exhibits retained by Mr. Radshaw.)

23

24

25
```

4

1            ... Deposition of KEVIN HAYES, taken

2       pursuant to Rule 30 of the Federal Rules of

3       Civil Procedure before Okeemah S. Henderson,

4       Licensed Shorthand Reporter and Notary

5       Public for the State of Connecticut, held at

6       the Law Offices of Howd & Ludorf, 65

7       Wethersfield Avenue, Hartford, CT commencing

8       at 10:12 a.m. on November 13, 2003.

9            S  T  I  P  U  L  A  T  I  O  N  S

10           It is hereby stipulated and agreed by

11      and among counsel for the respective parties

12      that all formalities in connection with the

13      taking of this deposition and the authority

14      of the officer before whom it is being

15      taken, may be and are hereby waived.  It is

16      further stipulated and agreed that

17      objections other than as to form are

18      reserved to the time of trial.  It is

19      further stipulated and agreed that the

20      reading and signing of said deposition by

21      the Deponent is hereby not waived.

22           It is further stipulated that the

23      proof of the qualifications of the Notary

24      Public before whom the deposition is being

25      taken is hereby waived.

5

```
 1              (Deposition convened at 10:12 a.m.)

 2

 3              KEVIN HAYES, being first duly

 4       sworn by Okeemah S. Henderson, LSR and

 5       Notary Public within and for the State

 6       of Connecticut, was examined, and

 7       testified on his oath as follows:

 8

 9                    DIRECT EXAMINATION

10       BY MR. RADSHAW:

11          Q.    Good morning, Mr. Hayes.  My

12       name is John Radshaw, and I represent

13       Chief Field and Deputy Chief Giampaolo

14       in a lawsuit you brought against the

15       City of Torrington Board of Public

16       Safety members and the Chief and the

17       Deputy Chief.

18          Today's exercise is going to be the

19       taking of your deposition in which we as

20       the counsel for the Defendants seek to

21       understand what facts and evidence you

22       might have and the contours of your

23       claims.  Have you ever had your

24       deposition taken before?

25          A.    No.
```

19

```
1            A.    I couldn't give you a date.

2       Again, that information is in the packet

3       provided to you.

4            Q.    When did you join the

5       Torrington Fire Department?

6            A.    1985.

7            Q.    Have you been continuously

8       employed by the Torrington Fire

9       Department since then?

10           A.    Yes.

11           Q.    Since 1985, have you been

12      employed by anyone else or any other

13      entity?

14           A.    Yes.

15           Q.    Who -- by whom have you been

16      employed other than the City of

17      Torrington since 1985 to the present?

18           A.    GLB Enterprises.

19           Q.    By anyone else?

20           A.    Formaggoni Oil Company.

21               MS. EPSTEIN:  Could you

22           spell that for us, please?

23               THE WITNESS:

24           F-O-R-M-A-G-G-O-N-I, that is

25           in Torrington.  The GLB
```

20

1      Enterprises is now in

2      Bridgewater, Connecticut.

3           Q.     (By Mr. Radshaw) By anyone

4      else?

5           A.     I'm currently a real estate

6      agent for Coldwell Banker, Bredice &

7      Dean, Torrington.

8           Q.     Anywhere else?

9           A.     Not that I recall at the

10     moment.

11          Q.     Starting with GLB

12     Enterprises, please, tell me the nature

13     of the employment at GLB Enterprises?

14          A.     Landscaper.

15          Q.     Are you still employed by

16     them?

17          A.     No.

18          Q.     Approximately what years

19     were you employed by GLB Enterprises?

20          A.     '85 to '90.  Again, I'm only

21     going by memory, I have no records in

22     front of me.

23          Q.     That's okay.  What about

24     Formaggoni Oil Company, what did you do

25     at Formaggoni Oil?

21

```
 1          A.     Oil delivery.

 2          Q.     And how long were you

 3   employed for Formaggoni?

 4               MS. ENGSTROM:  I'm sorry

 5        what?  Didn't you just ask him

 6        that and he said '85 to '9 --

 7               MR. RADSHAW:  No,

 8        that was GLB Enterprises.

 9               MS. ENGSTROM:

10        Sorry.  Different letters.

11               THE WITNESS:  I

12        don't remember.

13          Q.     (By Mr. Radshaw) Are you

14   currently employed by Formaggoni?

15          A.     No.

16          Q.     When was the last time you

17   worked for Formaggoni?

18          A.     I couldn't give you an

19   accurate answer.

20          Q.     Can you approximate within a

21   year or two when the -- the term that

22   you were employed by Formaggoni?

23          A.     No.

24          Q.     Why not?

25          A.     Because it was many years
```

22

1     ago.

2          Q.     How long do you think you

3     worked for them?

4          A.     I worked for them

5     approximately three years.


6          Q.     But that would have been

7     some time between 1985 and the present;

8     is that correct?

9          A.     Correct.

10          Q.     When did you start working

11     for Coldwell Banker?

12          A.     Approximately three years

13     ago.

14          Q.     And you're still employed by

15     them now?

16          A.     I'm not employed by them.

17     A real estate agent is a subcontractor.

18          Q.     But you have your license at

19     a local office; is that correct?

20          A.     Yes.

21          Q.     Who is your supervisor at

22     that local office?

23          A.     Rebecca Zanvelt.  No, I

24     cannot spell that.

25          Q.     Can you give it a --

23

1          A.     It would be Z-A-N-V-E-L-T.

2          Q.     Have you ever been a

3     plaintiff or defendant in a lawsuit?

4          A.     Could you rephrase the

5     question for me?

6          Q.     Sure.  Other than the

7     present lawsuit, have you ever been a

8     plaintiff or a defendant in a lawsuit?

9          A.     Such as referring to

10    question --

11               MS. ENGSTROM:  Plaintiff

12        or defendant means the

13        parties.  You are the

14        plaintiff they are the

15        defendant.

16         Q.     (By Mr. Radshaw) Do you

17    understand my question, Mr. Hayes?

18         A.     No.  Let's go back.

19         Q.     Have you ever been sued?

20         A.     Have I ever been sued?

21         Q.     That's right.

22         A.     No.

23         Q.     Have you ever sued anyone

24    else?

25         A.     Yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

24

```
 1              Q.      How many times have you sued
 2        somebody other than the present lawsuit?
 3              A.      There is a -- once.
 4              Q.      That refers to you acting as
 5        a landlord against Ms. Franco on Bantom
 6        Road in Bantom, Connecticut?
 7              A.      Yes.
 8              Q.      Do you own that property
 9        still today?
10              A.      Yes.
11              Q.      Do you own the property on
12        Funston Avenue?
13              A.      No.
14              Q.      Do you still own the
15        property on Bantom Road?
16              A.      I do not own the property on
17        Bantom Road, that is where Ms. Franco
18        says she resides.
19              Q.      Okay.  Where was the
20        property where Ms. -- where you sued
21        over the nonpayment of rent?
22              A.      200 East Elm Street,
23        Torrington.
24              Q.      Do you still own that
25        property here today?
```

25

```
 1          A.    Yes.

 2          Q.    Other than 200 East Elm

 3    Street, do you own any other real

 4    property?

 5          A.    No.

 6          Q.    Now, Mr. Hayes, the purpose

 7    of today's deposition is for counsel for

 8    the Defendants to understand the nature

 9    of your claims and to understand what

10    facts and evidence you have.   I'm

11    showing you a document that's been

12    marked as Defendants Exhibit 3.   Could

13    you take a look at that document and

14    tell me if you've seen it before?

15          A.    (The witness complies.) This

16    looks familiar, I may have seen it.

17          Q.    So you're not sure if you've

18    seen it?

19          A.    I don't recall really at

20    this time.

21          Q.    Okay.

22          A.    But it's dated from 2002,

23    that was over a year ago.  I may have

24    read it and I more than likely have read

25    it at that time but I have not reviewed
```

26

```
1     my paperworks to --

2          Q.    The document that's been

3     marked as Defendants' Exhibit 3 is dated

4     August 28, 2002 and it's captioned

5     complaint, it appears a docket number of

6     3:02CV01542.  Do you understand what

7     this document is?

8          A.    Yes.

9          Q.    And what's your

10    understanding of this document?

11         A.    This document names several

12    individuals in the City of Torrington

13    that I am suing for nonpromotion.

14         Q.    Okay.  Now, since you're

15    suing for your -- for not getting a

16    promotion, I'd like to direct your

17    attention to paragraph 6.  Do you have

18    paragraph 6 in front of you?

19         A.    Not yet.  Yes.

20         Q.    It states and at all times

21    mentioned in the complaint the

22    Defendants acted jointly and in concert

23    with each other.  Would you tell me all

24    the ways that Chief Field and Deputy

25    Chief Giampaolo acted jointly and in
```

27

```
 1          concert with the other defendants?

 2                A.      I cannot tell you all the

 3          ways.

 4                Q.      I would like you to tell me

 5          all the ways that you have knowledge of.

 6                A.      I cannot tell you all the

 7          ways at this moment without notes.   I

 8          can only tell you what I can remember at

 9          this moment.

10                Q.      Okay.  Let's start with what

11          you remember at this moment.

12                A.      The deputy chief, the acting

13          Deputy Chief, at the time, Giampaolo had

14          taken the exam, the same captain's exam

15          I had taken.  He was also the acting

16          deputy at the time of the promotion, he

17          was allowed to go into the executive

18          session with the Board of Safety to

19          assist or ask questions on the decision

20          of who would be the captain or who would

21          be promoted to captain.   The Chief had

22          allowed the Deputy to go into the

23          executive session knowing that he had

24          also taken the exam.

25                Q.      Are those all the ways that
```

28

1          the chief and the Deputy Chief acted

2          jointly and in concert with each other?

3               A.     No, that is not what I said.

4               Q.     Other than those two, are

5          there any other ways in which they acted

6          jointly and in concert with each other

7          to violate your rights?

8               A.     I'm sure there are others.

9          I had stopped for a moment to regain my

10         thoughts and you've asked me another

11         question.   This answer also I believe I

12         had answered this question with your

13         interrogatories.   Yes.   I believe that

14         was the same -- you had asked me this

15         question and I had answered it there, so

16         there may be more information that I had

17         provided to you.

18              Q.     Okay.   All right.   Well,

19         let's look at that, that answer.

20         Turning your attention to Defendants'

21         Exhibit 2 paragraph -- excuse me

22         interrogatory 11, the question and

23         answer I asked you to state factual

24         basis for your sentence that the

25         Defendants acted jointly and in concert

29

1    with each other as alleged in

2    paragraph 6 of the complaint.  Do you

3    see that?

4          A.    Yes.

5          Q.    And you see your answers

6    they're all Board of Safety members,

7    they allowed the Board to make their

8    decision based on rumor, not fact?  Do

9    you see that?

10          A.    Yes.

11          Q.    It doesn't say anything

12    about Deputy Chief Giampaolo being in

13    the executive session or Chief Field

14    allowing Giampaolo in the session, does

15    it?

16          A.    The answer here is they're

17    all Board of Safety members, they

18    allowed the Board to make their decision

19    based on rumor, not fact.

20          Q.    Is Deputy Chief Giampaolo

21    mentioned in the answer to interrogatory

22    11 at all?

23          A.    No, he is not.

24          Q.    In fact, is Deputy Chief

25    Giampaolo a member of the Board of

30

1    Public Safety?

2                MS. ENGSTROM:  I'm going

3         to object in terms of

4         vagueness.  At what time are

5         you talking currently or in

6         the past at the time of the

7         promotion?

8         Q.    (By Mr. Radshaw)  We'll

9    start with has Deputy Chief Giampaolo

10   ever been a member of the Torrington

11   Board of Public Safety?

12        A.    He is not listed as one of

13   the six we have listed here.

14        Q.    Okay.  Let me ask you

15   couple of better questions.  How is it

16   that people become members of the

17   Torrington Board of Public Safety, to

18   your knowledge?

19        A.    They're elected officials.

20        Q.    Are you aware that Deputy

21   Chief Giampaolo has ever run for

22   election on the Torrington Board of

23   Public Safety?

24        A.    No, I'm not aware.

25        Q.    And what about Chief Field,

31

1       do you know if he is a member of the

2       Board of Public Safety?

3            A.      In the statement manner of

4       question you had asked, no.

5            Q.      So when it says here they

6       are all Board of Public Safety members

7       referring to the Defendants by including

8       Chief Field and Deputy Chief Giampaolo,

9       that answer is incorrect, isn't it?

10           A.      I am not to make an

11      assumption.  I am not going to make a

12      judgment.

13           Q.      Did you understand my

14      question?

15           A.      They're all my supervisors.

16      I'm not finished.   They're all my

17      supervisors and following your question

18      as are they elected officials, no, they

19      are not.

20           Q.      Do you understand the

21      difference between Chief Field being

22      your supervisor and the Board of Public

23      Safety supervising the City of

24      Torrington Fire Department?

25           A.      Yes.

32

1          Q.    Could you, please, explain

2     to me the difference between those two

3     capacities?

4                    MS. ENGSTROM:   I just

5          want to interject for a

6          second.   I notice that you've

7          been throwing the exhibits at

8          us as you present them to us

9          and I'd really appreciate it

10         if the next time you present

11         an exhibit that you place it

12         on the table because I'd just

13         like to mention that I've

14         noticed that as part of your

15         style in conducting this

16         deposition.

17                    MR. RADSHAW:

18         Thank you.   I appreciate that.

19         Q.    (By Mr. Radshaw) Did you

20    understand that question?

21         A.    Would you ask the

22    stenographer to read it back, please.

23                    MR. RADSHAW:   Could you

24         read back my question.

25         (The last question was read back by the

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

33

1              reporter.)

2                    THE WITNESS:  Yes.

3         Q.    (By Mr. Radshaw) Could you,

4    please, explain to me the difference

5    between those two levels of supervision?

6         A.    The Board of Safety has more

7    supervision -- the Board of Safety has

8    or -- they have more of a general ruling

9    of the Department, they do not govern

10   the day-to-day operations of the

11   Department.

12        Q.    That's right because the

13   chief reports to the Board of Public

14   Safety; isn't that right?

15        A.    Yes.

16        Q.    Okay.  There's a chain of

17   command in the Torrington Fire

18   Department; isn't that right?

19        A.    Yes.

20        Q.    Okay.  And it would -- if

21   the chain of command would go down, it

22   would be the Board of Public Safety then

23   the chief and then the deputy chief; is

24   that correct?

25        A.    Yes.

34

1          Q.     And then the next level

2     would be the captain; isn't that

3     correct?

4          A.     Yes.

5          Q.     And below the captains would

6     be lieutenant; isn't that right?

7          A.     Yes.

8          Q.     Okay.  So do you believe

9     that Chief Field is a member of the

10    Board of Public Safety as you sit here

11    today?

12         A.     As your description as we

13    had described, no.

14         Q.     What about Deputy Chief

15    Giampaolo, is he an elected member of

16    the Board of Public Safety as you sit

17    here today?

18         A.     No, he is not a elected

19    member.

20         Q.     Were either Deputy Chief

21    Field -- excuse me, Chief Field or

22    Deputy Chief Giampaolo ever elected

23    members of the Board of Public Safety

24    for the City of Torrington in either the

25    year 1999, 2000, 2001 or 2002?

35

```
 1          A.    No.
 2          Q.    Okay.  Now, you were telling
 3    me that Deputy -- then acting Deputy
 4    Chief Giampaolo sat for the same
 5    examination as you did for promotion to
 6    captain; is that correct?
 7          A.    Yes.
 8          Q.    And after the written test,
 9    do you know where he scored?
10          A.    I do not remember.
11          Q.    Okay.  Do you know if it
12    was above you or below you?
13          A.    I do not remember.
14          Q.    Okay.  What about after the
15    oral boards and the final calculations
16    of scores including seniority, do you
17    know where Deputy Chief Giampaolo lay in
18    the rankings?
19          A.    No.
20          Q.    Well, who was first on that
21    ranking?
22          A.    Joe McElroy.
23          Q.    And who was second?
24          A.    I was.
25          Q.    And who was third?
```

36

1        A.      Either Smith or Starr.

2        Q.      Who was fourth?

3        A.      Either Smith or Starr.

4        Q.      So it would be fair to say

5    that Deputy Chief Giampaolo was not

6    first, second, third or fourth on the

7    possible list of promotion for the

8    available slots that existed on July 11,

9    2001; isn't that correct?

10       A.      Correct.

11       Q.      Okay.   So there is no way

12   that Deputy Chief Giampaolo could have

13   gotten promoted to captain at the July

14   11th 2001 meeting, could he?

15       A.      No.

16       Q.      Right because he wasn't in

17   the top four, correct?

18       A.      Correct.

19       Q.      Okay.   But you believe that

20   your rights were violated because he was

21   allowed to be in the executive session

22   of the Board of Public Safety on July

23   11, 2001; is that correct?

24       A.      Yes.

25       Q.      And you believe that Chief

37

1           Field violated your rights because he

2     allowed Giampaolo to be in the executive

3     session; is that correct?

4           A.    Yes.

5           Q.    Were you present during the

6     executive session of the Board of Public

7     Safety meeting on July 11, 2001?

8           A.    The executive session is

9     held behind closed doors.

10          Q.    I know that.  Did you

11    understand my question.  Were you

12    present at the executive session?

13          A.    I was at the Board of Safety

14    meeting and the executive session was

15    held behind closed doors and I was not

16    able to hear or be part of that

17    executive session.

18          Q.    So because you were not able

19    to hear or be part of that executive

20    session meeting on July 11, 2001, you

21    have no personal knowledge as to what

22    transpired during that executive

23    session; isn't that true?

24          A.    I did not attend the

25    meeting.

38

1          Q.     Did you understand my

2     question?

3          A.     Yes.

4          Q.     Do you have any personal

5     knowledge of what transpired?  Yes or

6     no?

7                    MS. ENGSTROM:  You mean

8          in the executive session?

9                    MR. RADSHAW:

10         That's correct.

11                   MS. ENGSTROM:

12         That's a yes or no.

13                   THE WITNESS:

14         When I'm asked a question, I

15         try to be as thorough as I

16         can.  Kindly allow me a

17         moment to finish gathering all

18         my thoughts before I answer

19         the question.

20                   MR. RADSHAW:   I

21         understand that and I will but

22         some of my questions call for

23         yes or no answers and that's

24         either a yes or no, it doesn't

25         call for an elaboration.

39

```
 1                   I'll ask you questions
 2          that will give you an
 3          opportunity to elaborate.
 4          When you don't answer a
 5          question yes or no to a yes or
 6          no question, you're evading my
 7          question.
 8                   MS. ENGSTROM:  No
 9          he's not, he's just asking for
10          some time. Give him 20, 30
11          seconds to stop and think and
12          let him answer your question.
13          Just wait.  He'll answer your
14          question.
15                   MR. RADSHAW:
16          There isn't a question
17          pending.
18                   MS. ENGSTROM:  He
19          said there is a question --
20                   MR. RADSHAW:  And
21          now you've interrupted me and
22          there's a big gap in the
23          record and --
24                   MS. ENGSTROM:
25          Then can you give him time,
```

40

1         that's all he's asking.

2                    MR. RADSHAW:

3         Fine.

4                    MS. ENGSTROM:

5         That's all he's asking.

6         Q.    (By Mr. Radshaw) Yes or no.

7    Do you have any knowledge of what

8    transpired during the executive session,

9    of what transpired in the Board of

10   Safety meeting on July 11, 2001?

11        A.    I did not attend the meeting

12   and therefore, I'm going to answer that

13   question with a no.

14        Q.    Thank you.   Other than your

15   response to interrogatory number 11 and

16   the two items that you identified for me

17   about Deputy Chief Giampaolo taking part

18   in the exam and being present during the

19   executive session and Chief Field

20   allowing Deputy Chief Giampaolo to be in

21   the executive session, are there any

22   other ways in which the Defendants were

23   acting in concert -- excuse me, acted

24   jointly and in concert with each other

25   as alleged in paragraph 6 of Exhibit 2,

41

```
 1        excuse me, Exhibit 3?

 2             A.    At this time I cannot think

 3        of anything else but I do believe that

 4        when I had given the written responses

 5        to your questions, I had given you the

 6        answers that I was able to provide.

 7             Q.    Okay.  So you're telling me

 8        that the answers to my questions in

 9        Exhibit 2 are not complete?

10             A.    No, I'm not saying that.

11             Q.    Okay.  What other ways did

12        the Defendants act jointly and in

13        concert with each other as alleged in

14        paragraph 6 other than what you've

15        already described to me concerning the

16        participation in the executive session

17        and your response to interrogatory No.

18        11?

19             A.    I believe I had given you

20        all the information that was available

21        to me at the time of the answers and I

22        had delivered them to you in this

23        interrogatories.

24             Q.    So if this document right

25        here Exhibit 2 is the only document that
```

42

1    I received from you listing your answers

2    to my questions, this document is

3    complete; is that correct?

4        A.    To the best of my knowledge.

5        Q.    Okay.

6              MS. ENGSTROM:  Excuse me.

7    Can we just take a break?

8              MR. RADSHAW:

9    Sure.

10    (A break was taken at 10:54 a.m.)

11    (Deposition resumed at 11:03 a.m.)

12        Q.    (By Mr. Radshaw) Back on the

13    record.  Mr. Hayes, now that we've come

14    back from the break, we were talking

15    about the answer to interrogatory 11 and

16    based on the first, the response and

17    interrogatory 11 and the two situations

18    you described for me concerning Deputy

19    Chief Giampaolo and Chief Field just so

20    we're clear, are there any other ways in

21    which they acted jointly and in concert

22    with each other to violate your rights?

23        A.    Again, I had answered the

24    questions the best I could at all times.

25        Q.    Okay.  Well, here's the

43

1          reason why I want to be clear.  You

2          filed the lawsuit over, just over a year

3          ago and the purpose of today's exercise

4          is to understand what facts and evidence

5          you might have in support of your

6          claims.  Do you understand that?

7                A.    Yes.

8                Q.    And I want to understand

9          what facts and evidence you have that

10         support that sentence of paragraph 6 and

11         that's why I sent you the

12         interrogatories.  Do you understand

13         that?

14               A.    Yes.

15               Q.    And we've covered three

16         situations, the statement that they're

17         all Board of Public Safety members and

18         the two situations with Deputy Chief

19         Giampaolo and Chief Field and sitting

20         here today, do you have any other facts

21         that would support the allegation in the

22         first sentence of paragraph 6 in the

23         complaint, yes or no?

24               A.    And can you reread his

25         question so I can answer it correctly,

44

1        please?

2        (The last question was read back by the

3                    reporter.)

4            Q.    (By Mr. Radshaw) And that

5        was other than what we've already talked

6        about, the instance with Deputy Chief

7        Giampaolo participating in the executive

8        session, Field allowing him to do so and

9        your response to interrogatory No. 11.

10       Do you understand the question?

11           A.    Yes.  I understand the

12       question but you're requesting that I

13       cover a very broad area with a very

14       simple yes and no answer and that makes

15       it very difficult for me and it's going

16       to take me a moment to answer that.

17           Q.    Okay.

18           A.    I can't answer that question

19       with a simple yes or no because it

20       covers a very broad area.   You're

21       asking me if from my understanding that

22       all the questions here I'm to answer

23       with one simple yes or no answer.   I

24       have answered them with the best of my

25       ability at all times.

45

```
 1              Q.    Let me ask you a preface to

 2        this question and this is not a trick,

 3        I'm not trying to trap you.  I like to

 4        think of it as what I'd call belt and

 5        suspenders and here is what I'm trying

 6        to accomplish.

 7              You make certain allegations in

 8        your complaint, okay, and based on those

 9        allegations, I have asked you questions

10        and you've given me written answers, all

11        right.  The purpose of this oral

12        examination is for me to say this last

13        question, set of questions we've gone

14        through is based on what's alleged in

15        the complaint, based on the answers that

16        you've given me in writing.  Do you have

17        anything else?

18              Wait, let me ask you a question and

19        in this context, I ask that and you gave

20        me two additional things that are not in

21        response to interrogatory No. 11,

22        there's nothing in there about Giampaolo

23        and Field.   All right.   So my last

24        follow up question is okay, we've talked

25        about the allegation in the complaint,
```

46

1    we've talked about your answer, we've

2    talked about the additional information

3    you -- that you've given me.  Is there

4    anything else, yes or no.

5        So I think I'm entitled to a yes or

6    no response because if you say yes,

7    there's anything else, I'm going to ask

8    you well, what is it?  If you say no,

9    we'll move on.  If you -- I mean, we're

10   going to stay here all day until you say

11   yes or no on this question because I

12   think that -- and if you don't know, if

13   you say I don't know, I can't remember,

14   I need you to tell me but by saying its

15   as complete as I could be, I don't think

16   that that fairly responds to my

17   question.

18       So that's really -- I'm not trying

19   to trick you.  I'm just trying to say

20   okay, this is an allegations, this is

21   the question, you've given me one answer

22   you gave me some more information, now I

23   want to find out if there's anything

24   else because you gave me a little bit

25   extra that's not in response.  Do you

47

1       understand my series of questions?

2               A.      I truly understand what

3       you're looking for and I had used a

4       different word than I believe you used,

5       I'm not sure, in part of your statement,

6       yes.  I'm not sure or I can't believe --

7       what was the other word now that you had

8       used and I believe I had used that same

9       theories that I have given you all the

10      answers I can and I really wish that I

11      could go back to use the same word that

12      you had used.  So -- and again, I do

13      not wish to be mentally jausting with

14      you or playing games in any way.  Yes,

15      I'm taking this very seriously and I'm

16      doing the best I can

17              Q.      The reason why I'm asking

18      you this is hypothetically in two weeks

19      you come up with some other answer to

20      that, I'm entitled to know what the

21      other bit of evidence is, that's why

22      we're here today is for me to get all

23      the information from you so if you

24      remember something in two weeks or you

25      decide to add something to your

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street

East Hartford, Connecticut  06108
(860) 291-9191     FAX:  (860) 528-1972

48

1       allegations in two weeks, that's trial

2       by ambush and that's something that the

3       federal rules don't allow, but I think I

4       understand your response and we'll move

5       on.

6                   MS. ENGSTROM:  I'd just

7            like to say if he does

8            remember something in two

9            weeks, he can certainly

10           supplement his answers.

11                  MR. RADSHAW:  Yes.

12                  MS. ENGSTROM:

13           That is -- that's permitted.

14           Q.    (By Mr. Radshaw) Turning to

15      your response to interrogatory No. 11,

16      the second sentence to your response

17      says, "They allowed the Board to make

18      their decision based on rumor, not

19      fact."  Who is they?

20           A.    We have a -- we meaning

21      myself and my lawyer have a testimony

22      from Mr. Potter.  Again, I'm -- some of

23      this is going by memory, so there may be

24      a little variation in time that he based

25      his decision or I should say one of his

49

1          decisions on a rumor that he had

2          referred to me as Lieutenant Dummy and

3          had not researched that matter.

4                  Q.      And where is that testimony

5          from?

6                  A.      The union grievance.

7                  Q.      Do you know when that

8          testimony was taken?

9                  A.      No, I do not.

10                 Q.      Was it in 2003?

11                 A.      Yes.

12                 Q.      Other than the testimony by

13         Potter that he based his decision on a

14         rumor referring to you as Lieutenant

15         Dummy, is there anyone else who is they

16         in the second sentence in response to

17         interrogatory No. 11?

18                 A.      We had interviewed two

19         people from the Board of Safety.   The

20         other person I believe was Zordan that

21         was his first meeting and we had -- his

22         decision making process, he, through

23         that question and answer period, he

24         himself had doubted or questioned the

25         process.   That information could be

50

1    provided to you if you don't have it.

2           Q.    Let's back up.  You said

3    that we interviewed two people.   Who is

4    we?

5           A.    The union which would be

6    Danny Huntsburger as my union

7    representation.

8           Q.    Did you personally interview

9    Potter or Zordan?

10          A.    No, I did not.

11          Q.    Did Zordan testify before

12   the State Board of Labor and Mediation

13   in connection with the grievance?

14          A.    Yes.

15          Q.    From that testimony is where

16   you learned that Zordan questioned the

17   promotion process as you just testified

18   for me?

19          A.    Yes.

20          Q.    Okay.   And were you present

21   during both the times -- withdraw that.

22   You were present at the State Board of

23   Labor and Mediation for Potter's

24   testimony?

25          A.    Yes.

51

```
 1          Q.      And you were present for

 2      Zordan's testimony as well?

 3          A.      Yes.

 4          Q.      Okay.  Now, you said that

 5      Zordan questioned the process; is that

 6      correct?

 7          A.      Yes.

 8          Q.      Did he have anything --

 9      withdraw that.  Did Zordan make his

10      decision based on rumor?

11          A.      I don't know completely and

12      I don't recall exactly how he made his

13      decision.

14          Q.      Okay.  Now, turning back to

15      paragraph 6 of the complaint.  The

16      second sentence says, "Each individual

17      Defendant had the duty and the

18      opportunity to protect the Plaintiff

19      from unlawful actions of other

20      Defendants but each Defendant failed and

21      refused to perform such duty thereby

22      approximately causing injuries herein

23      complained of." And I asked you in

24      interrogatory 12, state the factual

25      basis for your contention that Field and
```

52

```
1        Giampaolo failed to protect you.   Do

2    you see that?

3        A.    This one here that is marked

4    number 2?  That question 12?

5        Q.    Right.

6        A.    Correct.

7        Q.    And you see the answer, it

8    says Field and Giampaolo informally were

9    pushing Smith and Starr.  How do you

10   personally know that Field and Giampaolo

11   were pushing Smith and Starr?

12       A.    Through our grievance

13   hearings.

14       Q.    And how did you learn this?

15       A.    Testimony.

16       Q.    And who's testimony?

17       A.    Giampaolo's.

18       Q.    Okay.  And he said that he

19   was informally pushing Smith and Starr?

20       A.    Yes.

21       Q.    What specifically did he

22   say?

23       A.    I cannot answer

24   specifically, again, this was a time ago

25   that he had testified.   I can obtain
```

53

1    those records for you so that you know

2    more specifically of what he said

3    because we had a stenographer such that

4    we have today so we have a --

5         Q.    Right.  But you don't have

6    those transcripts at home, do you?

7         A.    I have a copy of them.

8    Yes.

9         Q.    But you didn't provide them

10   to the law firm of Williams and Pattis,

11   did you?

12        A.    I am -- I may not have.   I

13   had given them a tremendous amount of

14   information, stacks of it such -- I'm

15   using as an example the stack paper you

16   have in your hand there it's a large

17   stack as the amount of information that

18   I have handed in.

19        Q.    Well, this is?

20             MS. ENGSTROM:  I mean,

21        you can give it to us now,

22        we'll give it to him.  We can

23        produce it.

24             MR. RADSHAW:  I'm

25        going to show you a stack of

54

1        documents here and because I

2        only recently received them, I

3        don't have copies for

4        everybody but you can just put

5        those to the side, those are

6        the marked ones.

7          It's about 2 inches thick

8        and this is a package of

9        documents that I received as

10       production that was attached

11       to what was marked as

12       Defendants Exhibit 2.

13          Q.    (By Mr. Radshaw) Mr. Hayes,

14   would you take a look at that package of

15   documents and tell me if those were the

16   documents that you forwarded to your

17   lawyer in response to my request for

18   production of documents?

19          A.    (The witness complies.) I

20   don't -- this all looks very familiar.

21          Q.    Is there anything else that

22   should have been produced but wasn't?

23              MS. ENGSTROM:  Other than

24       the transcript he just

25       mentioned?  I mean, I think

55

```
1          they have the transcript

2          because they're on the other

3          side.   Torrington has the

4          transcript.

5                    MR. RADSHAW:

6          Unfortunately, I represent

7          Deputy Chief Giampaolo and

8          Field and I'm not a party to

9          that grievance proceeding and

10         we haven't received a

11         transcript.

12         Q.     (By Mr. Radshaw) So you have

13    a transcript of all the grievance

14    procedures; is that correct?

15         A.     Yes.

16         Q.     But other than that

17    transcript and other than these

18    documents, do you have any other

19    documents that support your claims?

20                    MS. ENGSTROM:   Currently

21         you mean?  At the present

22         time?

23                    MR. RADSHAW:  I'm

24         asking him.  If he doesn't

25         understand my question --  Do
```

70

1      keep Deputy Chief Giampaolo out of that

2      meeting.   Do you believe that Chief

3      Field without reference to a page,

4      paragraph or sentence of the code of

5      ethics, did Chief Field violate the code

6      of ethics?

7              A.     He may have.   Yes, sir.

8              Q.     And is that a claim that

9      you're making in your complaint?

10             A.     I'm not sure how to answer

11     that because I'm not sure if you're

12     referring back to the interrogatory

13     or --

14             Q.     Let's go back to July 11,

15     2001 the meeting at the Board of Public

16     Safety.  Do you remember what time it

17     was?

18             A.     No.

19             Q.     How did you get there?

20             A.     My car.

21             Q.     You drove yourself?

22             A.     No.

23             Q.     Who did you go with?

24             A.     Ms. Sue Talbot.

25             Q.     Approximately how many

71

1          people were present at the Board of

2          Public Safety meeting?

3                    A.      In the audience total?

4                    Q.      Estimate.

5                    A.      Seventy-five.

6                    Q.      Okay.   And did there come a

7          point in time during the meeting in

8          which some member of the Board of Public

9          Safety made a motion to go into

10         executive session to discuss promotions?

11                   A.      I'm sure they had made a

12         motion to go into executive session.

13         Whether it was to discuss promotions or

14         not, I don't know.

15                   Q.      But you were present when

16         the meeting began; is that correct?

17                   A.      Correct.

18                   Q.      And the executive session

19         took place some time after the public

20         section of the meeting began; is that

21         correct?

22                   A.      Yes.

23                   Q.      Okay.  And then at some

24         point the executive session ended and

25         the meeting returned to a public

72

1      session; is that correct?

2          A.    Correct.

3          Q.    Following the motion to go

4      into executive session, did you object

5      to the Board entering into executive

6      session to discuss promotions?

7          A.    Your question previously was

8      did I know they were going in to discuss

9      promotions?   Did I object to that they

10     were going in to discuss promotions?

11     All I know is they were going into

12     executive session.

13         Q.    So it's your testimony here

14     today that the Board -- you have no

15     knowledge of what the Board was going to

16     do in executive session; is that

17     correct?

18         A.    Correct.

19         Q.    So if I produced a certified

20     copy of the minutes of the July 11, 2001

21     Board of Public Safety meeting and in

22     there the secretary of the Board or the

23     person taking minutes wrote that a

24     member in the public session moved to

25     enter executive session for the purpose

73

1           of discussing promotions, you would

2           disagree with that statement in the

3           minutes?

4                   A.     No.

5                   Q.     But its clear you did not

6           object to the executive session at the

7           meeting on July 11th, 2001?

8                   A.     Correct.

9                   Q.     But the executive session

10          I'm talking about is the executive

11          session to which you objected to the

12          presence of Deputy Chief Giampaolo and

13          Chief Field; is that correct?

14                  A.     You have a lot of objections

15          and.

16                  Q.     I'll withdraw the question

17          and ask you another.

18                  A.     No.  That's okay.  I'm just

19          thinking about --

20                  Q.     I'll make you a clearer

21          question.

22                  A.     Okay.  Thank you.

23                  Q.     We were just talking about

24          an executive session during the Board of

25          Public Safety meeting, do you recall

74

1     that?

2          A.     Yes.

3          Q.     And there was only one

4     executive session during that public

5     safety meeting; is that correct?

6          A.     Yes.

7          Q.     And we had also talked

8     earlier about you objecting to -- I'll

9     withdraw that.   We had talked earlier

10    about you taking issue with Deputy Chief

11    Giampaolo participating in the executive

12    session in the Board of Public Safety;

13    is that correct?

14         A.     Yes.

15         Q.     Now, the executive session

16    to which you take issue the

17    participation of Giampaolo and Field, is

18    that the same executive session that you

19    did not object to when a motion was made

20    to go into executive session on July 11,

21    2001?

22         A.     Yes.   That is the same

23    meeting.

24         Q.     Okay.   Good.

25               MS. ENGSTROM:   Can we

75

```
1           take a break and just go

2           outside for a second?

3                    MR. RADSHAW:

4           Absolutely.

5

6           (A break was taken at 11:44 a.m.)

7           (Deposition resumed at 11:52 a.m.)

8

9           Q.    (By Mr. Radshaw) Now, Mr.

10   Hayes, as Lieutenant of the City of the

11   Torrington Fire Department, you're a

12   member of the union?

13          A.    Yes.

14          Q.    Is that Local 1567?

15          A.    Correct.

16          Q.    You were a member of that

17   union the entire time you've been

18   employed by the City of Torrington?

19          A.    Yes.

20          Q.    And as of today, neither

21   Chief Field or Deputy Chief Giampaolo

22   are members of that union?

23          A.    No, they are not.

24          Q.    And that because they're

25   management; isn't that correct?
```

80

1  were not going to be promoted.

2          Q.      Is that out of the

3  deposition of Mr. Avallone?

4          A.      Yes.

5          Q.      Other than the information

6  obtained from Mr. Avallone, do you have

7  any other knowledge, facts or evidence

8  that supports the contention that the

9  Defendants secretly decided to violate

10  unvarying past practice and not promote

11  the Plaintiff?

12          A.      The first part of your

13  question, was it referring to.

14          Q.      Other than.  Other than Mr.

15  Avallone's testimony, do you have any

16  other evidence that would support your

17  claim that prior to July 11, 2001 the

18  Defendants secretly decided to violate

19  unvarying past practice and not promote

20  you?

21          A.      Well, we have the

22  information provided from our grievance

23  hearings from Avallone, Giampaolo,

24  Potter, and again, I'm drawing a blank

25  but we have that information from those

81

1    hearings that support it.

2        Q.    Okay.   Maybe I'm not asking

3    a clear question.   When I ask you what

4    evidence you had to support your claim

5    that the Defendants decided to change

6    their past practices, you identified in

7    support of that allegation the testimony

8    of Mr. Avallone which related to that

9    telephone call he got from Deputy Chief

10   Giampaolo, do you recall that?

11       A.    Yes.

12       Q.    Now, other than that, what

13   other evidence do you have that supports

14   your claim that prior to the 11th they

15   decided to change what you believed to

16   be past practice?

17       A.    The only thing I can tell

18   you is that all the information I have I

19   had presented to you.   Again, I'm not

20   trying to sort the issue, I'm just --

21   it's the best answer I can give you is

22   that everything I have I have presented.

23       Q.    Okay.  Well, let me just go

24   back over what you presented so we can

25   be clear.   We covered earlier about the

82

1          rumor, not fact issue with Potter.  Do

2          you recall that?

3                    A.     Yes.

4                    Q.     And then you told me that

5          Zordan testified that he didn't like the

6          process.  Do you recall that?

7                    A.     Yes.

8                    Q.     Because it was his first

9          meeting, do you recall that?

10                   A.     Yes.

11                   Q.     And then you testified about

12         the testimony of Giampaolo about the

13         telephone call to Avalon; you recall

14         that?

15                   A.     Yes.

16                   Q.     And then you told me about

17         the what you believed to be the secret

18         meetings with Giampaolo and Potter and

19         Giampaolo and Telman.  Do you recall

20         that?

21                   A.     Yes.

22                   Q.     And on the specific issue of

23         the decision to change the past

24         practice, other than those items we've

25         just discussed, are there any other

83

1       specific facts that you have that would

2       support the allegations of paragraph 12?

3              A.     Again, I know you're trying

4       to get -- to have me say either yes or

5       no and what I'm telling you is I had

6       given you all the information I have.

7       You can perceive that as a yes or a no.

8       I have given you everything, there's

9       nothing more that I can think of then or

10      now.

11             Q.     Okay.  Now, turning your

12      attention to paragraph 14 of the

13      complaint it states the Defendants never

14      gave the Plaintiff any opportunity to be

15      heard or to address any reasons they may

16      have had for denying him the promotion

17      to which he was entitled.   Do you see

18      that?

19             A.     Yes.

20             Q.     Did you ever have a meeting

21      with Chief Field?

22             A.     Yes.

23             Q.     Okay.  And do you recall

24      when that meeting was?

25             A.     No, I do not.

84
```
 1                    MR. RADSHAW: Could you

 2           mark this as the next exhibit.

 3

 4      (Defendants' Exhibit No. 5, letter dated

 5           7/12/01, marked for identification.)

 6

 7           Q.     (By Mr. Radshaw) Mr. Hayes,

 8      I'm showing you a document that's been

 9      marked as Defendants Exhibit 5, it's on

10      the letterhead of Department of Fire

11      Service City of Torrington it's dated

12      July 12, 2001 its addressed to

13      Lieutenant Kevin Hayes and at the bottom

14      of the page there's the typewritten

15      words John B. Field, Jr. and there

16      appears to be a signature above it.   Do

17      you recognize that signature?

18           A.     Yes, I do.

19           Q.     You're familiar with Chief

20      Field's signature?

21           A.     Somewhat.   Yes.

22           Q.     Is that Chief Field's

23      signature?

24           A.     I would -- it appears to be.

25      Yes.
```

85

```
 1              Q.      This letter is addressed to

 2     you.  Did you receive it?

 3              A.      Yes.

 4              Q.      Approximately when did you

 5     receive it?

 6              A.      I'm going to guess by the

 7     date, so in that time frame, within a

 8     few days of that date.

 9              Q.      All right.  Now, following

10     the letter, did you take an opportunity

11     to meet with Chief Field as set forth in

12     the request?  In the last sentence it

13     says, "Please, stop by at any time to

14     discuss this or any other matter you

15     would like."

16              A.      Yes.

17              Q.      Do you have an idea when you

18     might have met with Chief Fields?

19              A.      No.   It was a short time

20     after this.

21              Q.      Okay.  If I told you that

22     there was a meeting between Chief Field,

23     yourself and Kevin Engle on August 15

24     2001, would you have any reason to

25     disagree with me?
```

86

1        A.    No.

2        Q.    Do you recall that meeting?

3        A.    Yes.

4        Q.    Can you tell me generally

5    what transpired on -- during that

6    meeting?

7        A.    Yes.

8        Q.    Please, tell me.

9        A.    I had -- we had gone in to

10    see the Chief and I requested again this

11    is going by memory from two years ago.

12        Q.    That's fine.

13        A.    That I had asked what I had

14    done or I should have been doing to be

15    promoted and I wanted to better myself

16    so for a future promotions and his

17    response at that was the Board of Safety

18    had made the decision and to look at

19    yourself.

20        Q.    Did he tell you anything

21    about producing a profile for the kind

22    of captain candidate that the board

23    wanted?

24        A.    He said the Board had

25    their -- I was going to say ideas but I

87

1        can't -- he said they had a profile or

2        someone they wanted and that's what they

3        were looking for.  I don't remember what

4        it was.

5            Q.    And the, but the chief

6        didn't tell you what the specifics of

7        that profile was, did he?

8            A.    Not to my recollection

9        because I would have used that to better

10       myself.

11           Q.    Okay.  And you believe

12       you're entitled to this profile; is that

13       right?

14           A.    Yes.

15           Q.    Okay.

16               MR. RADSHAW: Mark that

17         please.

18

19       (Defendants' Exhibit No. 6, grievance

20         letter dated 8/18/01, marked for

21             identification.)

22

23           Q.    (By Mr. Radshaw) Mr. Hayes,

24       I'm showing you a document that's been

25       marked as Defendants' Exhibit 6, its

88

```
1       titled grievance and there's some

2       typewriting on it and below the

3       typewriting it's difficult to see next

4       to the handwritten date of 8/18/01 but

5       it looks to be a signature.  Do you see

6       that?

7               A.      Yes.

8               Q.      Is that your signature?

9               A.      Yes.

10              Q.      This typewritten document,

11      did you create the typewriting?

12              A.      Yes.

13              Q.      And then the information

14      below it, there's some handwriting where

15      it say grievance committee agrees, there

16      is a signature there.  Do you know who

17      that is?

18              A.      Consolini.  I believe it to

19      be Steven Consolini.

20              Q.      This is a copy of the

21      grievance you filed to start that

22      grievance procedure; isn't that correct?

23              A.      Yes.

24              Q.      And you have several reasons

25      past practice, unjust discrimination an
```

89

```
1         conflict of interest; is that correct?

2              A.     But not limited to.

3              Q.     I understand that but those

4         are the ones that were listed?

5              A.     Yes.

6              Q.     Let's start with the past

7         practice.  Could you, please, describe

8         for me the past practices that are

9         referred to in this grievance?

10             A.     The promotions before the

11        one that I had grieved were always in

12        reference to their test scores and the

13        promotion after mine also referred to

14        promotion of the test -- with direct

15        relationship to the test score.

16             Q.     Are there any other past

17        practices that you claim were violated

18        in connection with your failure to be

19        promoted to captain?

20             A.     None that I can recall right

21        now.

22             Q.     Okay.  Unjust

23        discrimination.  Could you, please,

24        describe for me the unjust

25        discrimination, the basis for that as a
```

90

1      component of your grievance?

2          A.     Yes.    The acting Deputy

3      Chief at the time Giampaolo was allowed

4      to go into the executive session of the

5      board minutes, the Chief had accepted

6      and submitted a resume from one of the

7      other candidates.    The Chief allowed

8      the Deputy to go into the minutes, again

9      some of this is by memory and I'm --

10     there was sure several items listed or

11     documents and again, I'm trying to

12     remember them and this is a new process

13     for me, so.

14         Q.     Sure.

15         A.     I hope you understand.

16         Q.     Let's talk about that

17     resume.    The last two pages of

18     Defendants Exhibit 4A I think have been

19     referred to in the grievance process as

20     the portfolio.    Do you agree with that?

21         A.     Yes.

22         Q.     And that would be the

23     photograph of you and then there is a

24     one-page summary of your

25     accomplishments; is that correct?

91

1          A.      Yes.

2          Q.      And is it your testimony

3     that your rights were violated because

4     one of the other candidates submitted a

5     resume in lieu of the portfolio; is that

6     correct and you weren't allowed to

7     submit a resume?

8          A.      That whole statement is not

9     correct.

10          Q.      Please, describe -- tell me

11     why the resume versus the portfolio

12     matters?

13          A.      He may have -- the other

14     candidate may have, I don't know what

15     his resume read or what it had in it, I

16     was not privy to that information, may

17     have been more specific than my

18     portfolio.

19          Q.      So would it be fair to say

20     that because he was able to present more

21     specific information in the form of the

22     resume, you were prejudiced in the

23     promotion process?

24          A.      Yes.

25          Q.      Okay.   The last section

92

1       says conflict of interest.  Now, other

2       than -- we've already talked about

3       conflict of interest.  Do you recall?

4            A.     Yes.

5            Q.     And other than the conflict

6       of interest that you believe occurred

7       because of the presence of Deputy Chief

8       Giampaolo, are there any other conflicts

9       of interest that you claim support your

10      grievance?

11           A.     Again, there may have been

12      lists of things that we provided after

13      an hour and a half of -- almost two

14      hours of question and answer period, I

15      can't think of anything else at this

16      time.  Again, I don't mean to be

17      scorching the issues I just can't think

18      of anything else right now.

19           Q.     Okay.  Now, this grievance

20      is still pending; is that correct?

21           A.     Yes.  Again, I apologize

22      for the last meeting that we were

23      supposed to have and the grievance

24      hearing fell on the same day.  I

25      apologize for the short notice on the

93
```
 1        conflict of dates.

 2                       MR. RADSHAW:  Sure.  If

 3          you could you mark this as the

 4          next exhibit, please.

 5

 6        (Defendants' Exhibit No. 7, note dated

 7          8/24/01, marked for identification.)

 8

 9                       MS. ENGSTROM:  We'll just

10          go out for a second.  I'll be

11          right back.

12                       MR. RADSHAW:

13          Sure.

14          (A break was taken at 12:12 p.m.)

15

16          (Defendants' Exhibit Nos. 8-10,

17          agreements and complaint, marked for

18                 identification.)

19

20          (Deposition resumed at 12:19 p.m.)

21          Q.    (By Mr. Radshaw) Mr. Hayes,

22      we were talking about Exhibit 7.  Have

23      you seen that document before?

24          A.    No, I have not.

25          Q.    You see the typewritten
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

94
```
 1        words Michael Zavatkay?

 2              A.    Yes.

 3              Q.    And you say you're familiar

 4        with his signature?

 5              A.    Yes.

 6              Q.    Is that his signature above

 7        it?

 8              A.    Yes.

 9              Q.    Is he a union officer?

10              A.    Yes.

11              Q.    By the way, are you a union

12        officer at this time?

13              A.    No.

14              Q.    Have you ever been a union

15        officer?

16              A.    Yes.

17              Q.    From when to when did you

18        serve as a union officer approximately?

19              A.    I'm guessing it had to be

20        five, six years ago I was the union

21        secretary.

22              Q.    You were not a union officer

23        say from 1999 to the present; is that

24        correct?

25              A.    Correct.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

95

1          Q.     Since you haven't seen that,

2      that's fine.  I'll take that from you.

3      Now, you were telling me earlier today

4      Mr. Hayes, that you're a member of the

5      union; is that correct?

6          A.     Yes.

7          Q.     And do you understand again,

8      generally what a collective bargaining

9      agreement is?

10         A.     Yes.

11         Q.     And could you briefly

12     describe for me your understanding of

13     what a collective bargaining agreement

14     is generally?

15         A.     It's our union contract,

16     it's a group of employees come into an

17     agreement with supervisors or management

18     and set down some guidelines and rules

19     and regulations.

20         Q.     And the collective

21     bargaining agreement is the exclusive

22     understanding between management and the

23     bargaining union for the terms and

24     conditions in employment; isn't that

25     right?

96

1          A.     Yes.

2          Q.     And particularly these

3     agreements go for a period of years;

4     isn't that right?

5          A.     Yes.

6          Q.     And the document you have to

7     your left, it's marked Exhibit 8, it

8     says agreement between Local 1567

9     I.A.F.F. and the City of Torrington

10    1995, 1997.  Have you seen this document

11    before?

12         A.     Yes.

13         Q.     And this is the governing

14    collective bargaining agreement for that

15    time period; isn't that correct?

16         A.     Yes.

17         Q.     This covers things such as

18    the grievance procedure on Page 5.  Do

19    you see that and then later on Page 9,

20    it covers holidays and manpower and it

21    defines the work week; is that right?

22         A.     Yes.

23         Q.     It covers sick leave, too;

24    isn't that correct?

25         A.     Yes.

97

```
1              Q.     Also it covers your pay

2         rate, correct?

3              A.     Yes.

4              Q.     Turning your attention to

5         Page 49.

6              A.     (The witness complies.)

7              Q.     Article 29, do you see that

8         there?

9              A.     Yes.

10             Q.     That's a section that

11        governed appointments and promotions.

12        Do you see that?

13             A.     Yes.

14             Q.     You see the first sentence

15        of the section and it says, "All

16        promotions and appointments to the

17        Department shall be made by the

18        Department of Public Safety."

19             A.     Yes.

20             Q.     Would you agree with me that

21        the only way to get appointed to the

22        fire department or promoted in the fire

23        department is by a vote of the Board of

24        Public Safety?

25             A.     Yes.
```

98

```
1            Q.     And isn't it true that the
2       chief of the department has no legal
3       power to fully promote someone to a
4       specific rank or to appoint them to the
5       department?
6            A.     Yes.
7            Q.     And isn't it true that the
8       Deputy Chief has no power to similarly
9       promote or appoint to the department?
10           A.     In referring to the same way
11      you described the Chief, correct.
12           Q.     So the only way that someone
13      could be promoted at any time during the
14      period governed by this contract marked
15      as Exhibit 8 is by a vote of Board of
16      Public Safety; isn't that right?
17           A.     Yes.
18           Q.     Now, looking at Section 1
19      little A, little B, little C, and little
20      D, those sections governed at the
21      promotion procedure includes the scores,
22      the weighing of scores and the time and
23      manner of posting results, do you see
24      that?
25           A.     Yes.
```

99

```
 1              Q.     Are you making a claim that
 2       the City didn't properly weigh or
 3       calculate the scores or didn't post the
 4       results in the manner specified by
 5       little A, little B, little C and little
 6       D?
 7              A.     No, I'm not.
 8              Q.     Now, let's turn your
 9       attention to little E of Section 1 on
10       Page 51.   Do you have that in front of
11       you?
12              A.     Yes.
13              Q.     It says the top four
14       applicants names shall be submitted to
15       the Board of Public Safety in the order
16       of their scores.   Do you see that?
17              A.     Yes.
18              Q.     Okay.   Do you dispute that
19       the top four names for the captain's
20       promotion examination were, in fact,
21       submitted to the Board of Public Safety
22       on July 11, 2001 in the order of their
23       score?
24              A.     There is no record of that.
25              Q.     You believe there's no
```

100

1      record of that?

2          A.    Yes.

3          Q.    We'll hold that thought.

4                MS. ENGSTROM:  You mean,

5          the submission?

6                THE WITNESS:

7          There's no public record of

8          submission.

9          Q.    (By Mr. Radshaw) You don't

10     believe there's a public record?   Are

11     you positive?

12         A.    I am positive that there's

13     no public record of what the Chief had

14     submitted to the Board of Public Safety.

15         Q.    Well, I'm going to turn your

16     attention to Exhibit 4A and it's page --

17     you don't want to lose that.  I've got

18     the page right here, you don't want to

19     close Exhibit 8 because we're going come

20     right back to it.

21                MS. ENGSTROM:  Then we'll

22         just open it up again.

23                MR. RADSHAW:

24         Page 7 of Exhibit 4A which is

25         the document that was

101

1    submitted by you.

2         Q.    (By Mr. Radshaw) You've seen

3    that document before?

4         A.    This is a document submitted

5    to you, yes and yes, I have seen that

6    before.

7         Q.    And you provided that

8    document to me?

9         A.    Yes.

10        Q.    Do you believe that that

11   document was not provided to the Board

12   of Public Safety?

13              MS. ENGSTROM:   Objection

14        to the form.

15              MR. RADSHAW:   You

16        can answer that question.

17              MS. ENGSTROM:   Do

18        you understand what he's

19        saying?

20              THE WITNESS:    No

21        because I don't know what

22        you're saying.   The contract

23        states four names are

24        submitted to the Board of

25        Safety, this document has

102

1           approximately eight names on

2           it.

3                Q.     (By Mr. Radshaw) So you

4      don't know if that document was

5      submitted to the Board of Public Safety?

6                A.     Correct.

7                Q.     And you don't know what

8      document was submitted to the Board of

9      Public Safety that listed the names in

10     order?

11               A.     Correct.  I don't know what

12     was sent.

13               Q.     Do you believe a document

14     was provided to the Board of Public

15     Safety that had the names out of order?

16               A.     I don't know what was

17     submitted to the Board of Safety, I

18     don't know if they were in order, out of

19     order -- let me finish, please, because

20     I had requested that document at the

21     city clerk's office and they said they

22     had no record of it.

23               Q.     Okay.  But that doesn't

24     mean it doesn't exist, does it?

25               A.     No, it does not.   Correct.

103

1          Q.    Go back to Exhibit 8, Page

2     51 Section E?

3          A.    Which number, again, please,

4     8 or 9?

5          Q.    Eight.  We're going to go to

6     9 in just a minute.

7          A.    Page 51?

8          Q.    Yes.  As part of your

9     lawsuit, are you claiming that your

10    rights were violated because the names

11    were not submitted to the Board of

12    Public Safety in the order of their

13    scores as required by Section E of the

14    collective bargaining agreement?

15         A.    What I am claiming is I

16    don't know what names were submitted.

17    I asked for a record at the City clerk's

18    office, I was not able to get anyone, he

19    had no record.

20         Q.    Do you have any evidence

21    that would suggest that the names --

22    that the top four names were not

23    submitted to the Board of Public Safety

24    in the order of their scores?

25         A.    No.

104

1           Q.      Now, let's turn to the

2      second half of Section E where it says

3      said board public -- Board of Public

4      Safety shall select any one of said

5      candidates and appoint to the position

6      forthwith.  Do you see that?

7           A.      Yes.

8           Q.      Would you agree with me that

9      that allows the Board of Public Safety

10     to pick any one of the available

11     candidates and promote them?

12          A.      Yes.

13          Q.      It doesn't say it should

14     promote the first one, then the second

15     one, then the third one, then the fourth

16     one based on those scores, does it?

17          A.      No, it does not.

18          Q.      So this particular statement

19     in the collective bargaining agreement

20     is exactly opposite of what your claim

21     is in your lawsuit that the Board was

22     required to promote individuals in the

23     order of their scores, isn't it?

24                  MS. ENGSTROM:  Objection

25          to form, not in evidence.

105

1                    MR. RADSHAW:

2           That's not an objection to

3           form and I'd appreciate you

4           not editorialize because I've

5           got to pay for that portion of

6           the transcript.  Did you

7           understand my question, Mr.

8           Hayes?

9                    MS. ENGSTROM:  I

10          don't understand what you mean

11          by that.

12                   MR. RADSHAW:  Did

13          you understand my question?

14                   THE WITNESS:  No.

15                   MR. RADSHAW:  I'll

16          withdraw and ask you another

17          question.

18          Q.     (By Mr. Radshaw) Section E

19     grants the Board of Public Safety the

20     complete discretion to promote any one

21     of the people of the four names that

22     they're provided to him, doesn't it?

23          A.     Yes, it does.

24          Q.     And it doesn't require them

25     to promote in any particular order, does

106

1      it?

2           A.     The contract does not.

3           Q.     And the terms of the

4      contract are contrary to your position

5      that the Board of Public Safety was

6      required to promote in order of their

7      scores; isn't it?

8           A.     One of my positions, not all

9      of.

10          Q.     Okay.  Now let's turn to

11     Exhibit 9.  Now, let me ask you a couple

12     of more questions about Exhibit 8.

13     You've received that document, haven't

14     you?

15          A.     Yes, I got a copy.

16          Q.     You got a copy of it because

17     you're bound by those terms and

18     conditions; is that correct?

19          A.     Yes.

20          Q.     And the document that's been

21     marked as Defendants' Exhibit 9 it says

22     agreement between Local 1567 I.A.F.F.

23     in the City of Torrington 1997 to 2001

24     you've received a copy of this document,

25     haven't you?

107

1          A.     Yes.

2          Q.     Because you're a member of

3     the bargaining unit, correct?

4          A.     Yes.

5          Q.     And this document governed

6     the terms and conditions of your

7     employment in the same way that the

8     previous document we just discussed;

9     isn't that correct?

10          A.     Correct.

11          Q.     And if you turn to Page 41

12     where it covers appointments and

13     promotions, this section is, in fact,

14     verbatim of what was in Exhibit 8, isn't

15     it?

16          A.     Yes.  I'm sure it is.

17          Q.     For the period of 1997 to

18     2001, the Board of Public Safety had the

19     exclusive right to promote and appoint;

20     isn't that correct?

21          A.     Yes.  Yes.

22          Q.     And Deputy Chief Giampaolo

23     and Chief Field had no power by the

24     terms and conditions of the collective

25     bargaining agreement to promote and

108

1       appoint; isn't that correct?

2            A.     Terms and conditions of the

3       contract, correct.

4            Q.     And Section 1E that is the

5       verbatim Section 1E here in Exhibit 9 as

6       what was set forth in Exhibit 8; isn't

7       that correct?

8            A.     This is verbatim relating to

9       the same article on the same number as

10      what is in that one.

11           Q.     Yes.

12           A.     Yes.

13           Q.     So our previous discussion

14      concerning Exhibit 8 Article 29 section

15      1 little E would apply equally to

16      Article 29 Section 1 little E of

17      Exhibit 9; isn't that correct?

18           A.     Yes.

19           Q.     Now, we were talking earlier

20      today about the complaint.   And that's

21      Exhibit 3 with regard to paragraph 16 of

22      the complaint.  You have that there in

23      front of you?

24           A.     Yes.

25           Q.     You allege that the

109

1        Defendants to this day have never

2        advised the Plaintiff of their reasons

3        for denying him promotion; isn't that

4        right?

5              A.      Correct.  They never gave me

6        a reason why they haven't promoted me.

7              Q.      But during the meeting on

8        October 15, 2001, the Chief told you

9        that you didn't fit the Board's profile;

10       isn't that right?

11             A.      Correct.

12             Q.      He gave you a reason, didn't

13       he?

14             A.      No.

15             Q.      By the Chief telling you

16       that you did not fit the Board's profile

17       was not a reason for you not being

18       promoted?

19             A.      What is the Board's profile?

20             Q.      Did you understand my

21       question?

22                    MS. ENGSTROM:  Objection

23        to the form.  Argumentative.

24                    MR. RADSHAW:  Okay

25        that's not -- do you

110
1       understand my question?

2                    THE WITNESS:

3       Let's go back to the question

4       again.  Just the same

5       question, please.

6                    MR. RADSHAW:  I'll

7       ask it in smaller parts so we

8       don't have a problem.

9       Q.    (By Mr. Radshaw) You met

10      with the Chief in August of 2001,

11      correct?

12      A.    Yes.

13      Q.    And at that time you asked

14      him why you weren't promoted and he told

15      you that the Board had a profile; isn't

16      that right?

17      A.    Yes.

18      Q.    And he told you that you

19      didn't meet the profile; isn't that

20      correct?

21      A.    Yes.

22      Q.    Now, if the Board had a

23      profile and you didn't meet it, isn't

24      that a reason for not being promoted?

25      A.    Well, I assume that the

111

1    Board's profile was a job description

2    which I had met.

3        Q.    And you think that's the sum

4    total of the requirements for being

5    promoted?

6        A.    Sum total, no, again some of

7    that job description doesn't also

8    include some of your outside activities

9    which may have been important to one of

10   the board members.

11       Q.    Do you know if Lieutenant

12   McElroy met all of the conditions of the

13   job description for captain?

14       A.    I'm sure he has.  He's very

15   intelligent, visual, he's going to

16   school.  He's a go-getter.

17       Q.    Are you friends with

18   Lieutenant McElroy?

19       A.    Social acquaintance.

20       Q.    Do you socialize with him

21   outside of work?

22       A.    No.

23       Q.    Did you talk to him prior to

24   coming here today about today's

25   deposition?

120

1          Q.    That's fine.  Okay.  One of

2     the items you mentioned concerning your

3     emotional distress is you question your

4     abilities and in particular you

5     questioned whether or not you should

6     become politically active.   Why do you

7     believe that you might need to become

8     politically active?

9          A.    Can I go back for a moment

10    again?

11         Q.    I'll tell you what, if you

12    want to clarify one of your answers,

13    it's something your attorney can raise

14    on redirect.

15         A.    No, I want to --

16         Q.    You want to add to that

17    list?

18         A.    Yes.

19         Q.    Then absolutely?

20         A.    I am assigned to Captain

21    Smith's shift.  So every day I go to

22    work, I see Captain Smith and I have to

23    take direction from him.

24         Q.    Okay.  But I want to go

25    back to the politically active.

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

121

```
1         A.    Yes.

2         Q.    What makes you think you

3    might have to become politically active

4    in order to get promoted?

5         A.    I don't know of what really

6    I need to do.  I thought I had performed

7    all my duties.  I followed the job

8    description, I have performed some union

9    functions to know the union process to

10   say the contract.  I have done outside

11   duties, I've been on the board of

12   director for the homeless shelter,

13   outside duties Christmas for Children,

14   toy drive for seven years, ran programs.

15   I had thought and I had presumed that if

16   I had followed the outline set forth by

17   the chiefs and deputies, not only by

18   Chief Field and Deputy Giampaolo, by my

19   chiefs before him that all these things

20   together would help me get promoted.

21        Q.    Okay.  But concerning

22   political activity, that's just

23   speculation on your part; isn't that

24   right?

25        A.    Speculation, I don't know.
```

122

1          Q.    Now, you're familiar with we

2     already talked about with Joe McElroy;

3     isn't that right?

4          A.    Yes.

5          Q.    And you share the same

6     lawyers; isn't that right?

7          A.    Yes.

8          Q.    And have you had an

9     opportunity to discuss with him the fact

10    that both you and he are kind of in the

11    same boat, not being promoted despite

12    being number one and two on the list?

13         A.    Yes.

14         Q.    And you're familiar enough

15    with your own facts and circumstances

16    because except for the fact that you

17    scored second and Joe scored first,

18    you're largely in the same

19    circumstances?

20         A.    Yes.

21         Q.    Okay.   Now, and you know

22    that he's filed a lawsuit, right?

23         A.    Yes.

24         Q.    I want to turn your

25    attention to paragraph 20 of the

123

1      complaint.  I think its Exhibit 3.

2              A.      (The witness complies.)

3              Q.      Last paragraph says in the

4      manner described above the Defendants

5      intentionally treated the Plaintiff

6      differently from other similarly

7      situated members of the Torrington Fire

8      Department, that is, differently from

9      every other top score and otherwise

10     qualified applicant for promotion within

11     that department.  Do you see that?

12             A.      Yes.

13             Q.      Now, you told me earlier

14     that you believe that Joe McElroy met

15     the requirement of the captain's job

16     description; isn't that right?

17             A.      Yes.

18             Q.      He's a hard-working guy?

19             A.      Yes.

20             Q.      And you know him because

21     you've worked with him?

22             A.      Yes.

23             Q.      And you know he's studious

24     and conscious and a good firefighter;

25     isn't that right?

124

1          A.     Yes.

2          Q.     And you and he are in

3    completely the same position with regard

4    to your denial of promotion, the only

5    difference between your claims is that

6    he scored highest and you scored second

7    highest; isn't that right?

8          A.     That's a pretty good general

9    state.

10          Q.     Are there any other material

11    differences between you and him?

12          A.     Yes.  I have a college

13    degree.  I have two associate's degrees.

14          Q.     But he still scored higher

15    than you on the promotion?

16          A.     Yes.

17          Q.     Do you think that a college

18    degree, despite you scoring second

19    highest, would have made a difference in

20    promotion?

21          A.     I don't know.  I don't know

22    what the Board of Safety were thinking

23    or what their criteria was and that's

24    part of my misunderstanding.  It may

25    have.

125

1              MR. RADSHAW:  We're going

2         to take a 2 minute break and

3         I'm going to use the men's

4         room.

5         (A break was taken at 12:48 p.m.)

6         (Deposition resumed at 12:59 p.m.)

7         Q.    (By Mr. Radshaw) Mr. Hayes,

8     I don't have -- I just got a few more

9     questions, Mr. Hayes.  I'm going to show

10    you a document that has been marked as

11    Defendants Exhibit 10 and you should

12    keep Defendants Exhibit 3 there in front

13    of you or excuse me, Exhibit 2 whatever

14    the other complaint is right there in

15    front of you.

16              MS. ENGSTROM:  They're

17         mine.  I think he wanted to

18         supplement his testimony but

19         we can do it later.

20         Q.    (By Mr. Radshaw) We'll talk

21    about it.  The document in front of you

22    Defendants Exhibit 10 appears to be a

23    complaint, its captioned Joseph McElroy,

24    it's dated looks to be October 26, 2002,

25    it's five pages long.  Have you seen

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX:  (860) 528-1972

126

1      this document before?

2              A.      No, I have not.

3              Q.      I'd like you to take a look

4      at that document and the document we've

5      marked here today, Defendants Exhibit 3,

6      we're just going to look at the first

7      page and other than the caption I just

8      want to focus on paragraphs 1, 2 and 3.

9              Do you see any difference?  When I

10     say, difference, I mean, words, not

11     necessarily their layout on the page,

12     like which line they're on but do you

13     see any differences between the words in

14     paragraphs 1, 2 and 3 on Exhibit 3 and

15     those on Exhibit 10?

16             A.      They appear to be the same.

17             Q.      So if we turn to the second

18     page and just focussing on paragraphs 4,

19     5 and 6, those paragraphs appear to both

20     be the same on Exhibit 3 and Exhibit 10?

21             A.      Scanning them quickly, they

22     appear to be the same.

23             Q.      Starting with paragraphs 7

24     on the bottom of each page and going to

25     paragraph 8, would you agree that the

127

1    only material difference in 7 and 8 on

2    each case is that on Defendants' Exhibit

3    10 it states that he took the

4    examination for that position and

5    received the highest score while in

6    Exhibit 8 there's an additional

7    sentence -- excuse me, in Exhibit 3

8    there's an additional sentence in

9    paragraph 8 that says there were two

10   vacant captains positions and that the

11   Plaintiff received the second highest

12   score?

13        A.    Which number is that?

14        Q.    We're just looking at

15   paragraph 8, which would be the only

16   difference in your complaint, Exhibit 3

17   has you receiving the second highest

18   score, right?

19        A.    Yes.

20        Q.    And that paragraphs 9 and 10

21   are the same in both exhibits?  Yes?

22        A.    Yes.  They appear the same.

23        Q.    The only difference from

24   paragraph 11 is in Exhibit 2 it says the

25   Plaintiff was the second highest scoring

128

```
 1        and in Exhibit 10 it says the Plaintiff

 2        was the highest scoring?

 3              A.      Correct.

 4              Q.      And paragraphs 12 and 13 are

 5        the same?

 6              A.      Correct.

 7              Q.      And paragraphs 14 through 22

 8        and the wherefore clause are all the

 9        same, aren't they?

10              A.      After quick scanning, they

11        appear to be the same.

12              Q.      No problem.  Okay.  Do you

13        have anything else you wanted to modify

14        or supplement your testimony based on

15        the questions I've asked you here today?

16              A.      Yes.

17              Q.      Please, tell me?

18              A.      I was the acting captain,

19        I'm not sure if I clarified it or not.

20        During the time of retirement of Captain

21        Hudak and promotion during that time, I

22        was the captain.  I was the acting

23        captain, the shift supervisor on a

24        day-to-day basis.  The only time it

25        varied any is if there was a hired
```